No. 91-589

IN THE SUPREME COURT OF THE STATE OF MONTANA

1993

SIMMONS OIL CORPORATION and
SIMMONS REFINING CORPORATION,

 Plaintiffs and Appellants,

v.

HOLLY CORPORATION; NAVAJO REFINING
COMPANY; NAVAJO NORTHERN, INC.;
WELLS FARGO BANK, N.A.,

 Defendants and Respondents.

APPEAL FROM: District Court of the Eighth Judicial District,
 In and for the County of Cascade,
 The Honorable Roy C. Rodeghiero, Judge presiding.

COUNSEL OF RECORD:

 For Appellants:

  H. Charles Stahmer, Bozeman, Montana;
  James Goetz, Goetz, Madden & Dunn, Bozeman,
  Montana; Charles J. Wisch, Weissburg and
  Aronson, Inc., San Francisco, California

 For Respondents:

  Steven M. Perry, Munger, Tolles & Olson,
  Los Angeles, California; John D. Stephenson, Jr.,
  Jardine, Stephenson, Blewett & Weaver, Great Falls,
  Montana, for Wells Fargo Bank, N.A.

FILED

Filed: APR 2 8 1993

*Ed Smith*

CLERK OF SUPREME COURT
STATE OF MONTANA

Submitted: September 24, 1992

Decided: April 28, 1993

Clerk

Justice R. C. McDonough delivered the Opinion of the Court.

This is an appeal from an order of the Eighth Judicial District, Cascade County, granting respondent's motion for summary judgment. We affirm in part and reverse in part.

Appellant Simmons Oil Corporation (SOC) and Simmons Refining Corporation (SRC) (collectively referred to as "Simmons") alleged claims against Wells Fargo Bank for breach of fiduciary duty, tortious breach of the implied covenant of good faith and fair dealing, and civil conspiracy with Holly Corporation, resulting in Holly's breach of partnership fiduciary duty owed to Simmons.

The central question on appeal is whether respondent established the complete absence of any genuine issues of material fact to justify a summary judgment ruling as a matter of law. Appellant requests this Court to reverse summary judgment on the grounds that the District Court erred in granting this ruling in light of the material factual controversy that exists.

## ISSUES

1.    Did the District Court err in granting summary judgment as to the claims brought against respondent Wells Fargo by appellant Simmons for breach of a fiduciary duty?

2.    Did the District Court err in granting summary judgment as to the claims brought against Wells Fargo for breach of the implied covenant of good faith and fair dealing?

    a.    Did Wells Fargo merely exercise its contractual rights or did its actions constitute a breach of the covenant of good faith and fair dealing implied in every contract?

2

b.  Did a "special relationship" exist between Simmons and Wells Fargo to support a tort claim for bad faith?

3.  Did the District Court err in granting summary judgment as to the claims against Wells Fargo alleging civil conspiracy with Holly to breach Holly's fiduciary duty to Simmons?

On December 22, 1988, Simmons filed this action in District Court to recover damages from Wells Fargo Bank for breach of fiduciary duty, breach of the implied covenant of good faith and fair dealing, and conspiracy.  Simmons also sued Holly Corporation and two of its wholly owned subsidiaries, Navajo Refining Corporation and Navajo Northern, Inc. (collectively "Holly"), on similar allegations. In February 1989, both Wells Fargo and Holly moved to dismiss for lack of personal jurisdiction and the court granted these motions on May 1, 1989.  Simmons appealed this dismissal, and in July 1990 this Court reversed and remanded for further proceedings in a published opinion, Simmons Oil Corp. v. Holly Corp. (1990), 244 Mont. 75, 796 P.2d 189.

Upon remand to the District Court, Wells Fargo and Holly filed motions for summary judgment which were argued.  On October 17, 1991, the District Court filed its orders granting summary judgment for all defendants, and Simmons appealed.

Prior to the filing of opening briefs, Simmons settled its dispute with Holly, and in February 1992, appellants and Holly filed in this Court a joint stipulation for voluntary dismissal of the appeal from the order granting summary judgment to Holly.  The only remaining respondent is Wells Fargo.

3

Simmons' allegations against Wells Fargo focus on the occurrence and interpretation of certain events during the eight year period of the loan relationship. The following basic chronology is not disputed by the parties:

Beginning in 1980, Wells Fargo provided SOC a line of credit, which was increased to $18 million in 1981 when SOC's wholly owned subsidiary, SRC, purchased the Black Eagle Oil Refinery in Great Falls. The credit was to be used for working capital and acquisition of inventory and SOC and SRC ("Simmons") agreed the line of credit would be reduced to $10 million by May 1982.

Simmons began experiencing financial difficulties in early 1982, was unable to reduce the debt as agreed upon, and thereafter Wells Fargo closely monitored the refinery's operating performance. Although Wells Fargo held off exercising its undisputed foreclosure rights, throughout 1983 and 1984 the bank urged Simmons to initiate voluntary bankruptcy proceedings. During this time, Simmons attempted to sell assets and find equity partners or additional financing.

In 1984, Simmons, Wells Fargo, and Holly entered into an agreement which authorized the formation of Montana Refining Company (MRC), a partnership, to run the refinery. MRC some of Simmons' debt and a Holly subsidiary, Navajo Northern, Inc., became the sole general partner and took control of the refinery. Simmons' subsidiary, SRC, the sole limited partner assumed a passive role in the refinery's operation.

4

The remaining Simmons debt was restructured in January 1985, and Simmons executed two new notes totalling approximately $12.6 million. Mutual general releases were executed between Wells Fargo and all of Simmons' entities, except SRC. This included releasing Mr. and Mrs. Simmons from their personal guarantees of the preexisting corporate debt. (Mr. Simmons is president of both SRC and SOC.)

Contacts between Wells Fargo and Simmons decreased substantially by late 1985, and Jerry Simmons had no conversations with any Wells Fargo officer or employee during the subsequent two years.

The 1985 restructuring agreement allowed an assignment by Wells Fargo of its rights and duties under the agreement. On April 25, 1988, after several years of unfavorable refinery operations and minimal debt service, Wells Fargo sold Simmons' and the MRC notes to Holly. This sale resulted from Holly's assertions that the sale of the notes was Holly's "stated price for continuing to support the refinery" and that it might tender its inventory to Wells Fargo and "walk away" if the sale was not forthcoming.

Simmons had been negotiating with Wells Fargo directly regarding a purchase of the notes, but negotiations had broken down earlier in the month and prior to culmination of the sale between Holly and Wells Fargo, Wells Fargo rejected a proposal from Simmons for Simmons' purchase of the notes on exactly the same terms and conditions as offered to Holly.

5

Simmons then filed this suit alleging that Holly and Wells Fargo wrongfully refused to allow it to purchase the debt on the same terms given to Holly and that the sale constituted a breach of fiduciary duty and bad faith.

While the foregoing chronology is not in contention, both parties, in their briefs, provide specific details surrounding these events which vary significantly. Simmons argues, and substantiates with documentation, that Wells Fargo exercised considerable control over the refinery's operation between 1982 and 1984; that it forced Simmons into the partnership with Holly on terms and conditions specified by the bank; that it secretly negotiated with Holly when it assigned the debt; and that it knew that Holly planned to use the debt to force Simmons out of the partnership and avoid Holly's partnership fiduciary duty to Simmons. Simmons' allegations of breach of duty and bad faith are premised on these purported facts.

Wells Fargo maintains that the control exercised over Simmons was an attempt to work with Simmons to regulate costs and seek additional funding sources rather than exercising foreclosure rights on the assets. Wells Fargo notes that Simmons was free to reject Wells Fargo's advice, and did, such as advice concerning filing for bankruptcy. Furthermore, Wells Fargo asserts that the sale constituted an exercise of an express and unrestricted contractual right; that Simmons was aware of Holly's negotiations to purchase the debt from Wells Fargo and chose not to contact the bank with an offer to purchase the debt until after a Holly/Wells

6

Fargo letter of intent was signed; and finally, that since the assignment right was unrestricted, a covenant of good faith and fair dealing should not be implied to vary the express, unambiguous terms of the contract.

## BREACH OF FIDUCIARY DUTY

In Montana, "[t]he relationship between a bank and its customer is generally described as that of debtor and creditor...and as such does not give rise to fiduciary responsibilities." (Citation omitted.) Diest v. Wachholz (1984), 208 Mont. 207, 216, 678 P.2d 188, 193. However, in certain circumstances, a fiduciary duty may result from the development of a special relationship akin to an "advisor/advisee." This "special" relationship must exist before a fiduciary duty arises. Deist, 678 P.2d at 193.

Appellant contends that respondent had a fiduciary duty to Simmons because it exercised substantial control over the operations of the corporation, thus providing the special relationship necessary to create a fiduciary duty. Respondent counters that Simmons' rejection of the bank's advice and subsequent retention of independent legal counsel terminated any fiduciary relationship there may have been.

Also, respondent states that Wells Fargo made their decision to sell the Simmons' debts for "solid business reasons." Furthermore, Wells Fargo had a right to assign the notes per the 1985 Restructuring Agreement.

7

"This Court has recognized that no fiduciary duty arises between a bank and its borrower where the bank did not offer financial advice, its advice was not always heeded, or where the borrower was advised by others, such as legal counsel." Lachenmaier v. First Bank Systems, Inc. (1990), 246 Mont. 26, 33, 803 P.2d 614, 619. Although Wells Fargo exerted considerable control over the business until 1984, appellants retained independent legal counsel in 1984 and 1985. Legal counsel advised Simmons concerning the 1984 Master Agreement and the 1985 Restructuring Agreement.

This Court, however, concludes that the Master Agreement definitively terminated any fiduciary duty that Wells Fargo may have had to Simmons. In the master agreement, SRC transferred all rights and assets of every kind and description, (with minor exceptions) to MRC, creating the Montana Refining Company limited partnership. SRC and Navajo Northern, Inc. filed a certificate of limited partnership with the Secretary of the State of Montana for the purpose of acquiring the assets of SRC. Navajo Northern was the general partner of the MRC and SRC was the limited partner.

Although Wells Fargo was involved in day-to-day operations of the refinery before 1984 exercising control over nearly every facet of the business, that close relationship was not evident thereafter. After the master agreement forming the limited partnership of MRC, Navajo Northern took over the management and control of MRC. There is no evidence that Wells Fargo continued to

exercise daily control over the refinery once it became a limited partnership.

Wells Fargo's direct contact with Simmons also decreased after the master agreement. The following excerpt from Jerry Simmons' transcript reveals a drastic decline in communication between the plaintiff and the defendant in 1985 through 1987.

> Q. Subsequent to August of 1985, through the end of 1987, how frequently did executives of Simmons entities have contact with personnel at Wells Fargo Bank?
>
> A. Would you give me the time frame again?
>
> Q. August of 1985 through the end of 1987.
>
> MR. WISCH: Well, he's already testified about the contact in November of '85.
>
> MS. HYMANSON: In November '85.
>
> MR. WISCH: So you want to start in August?
>
> Q. BY MS. HYMANSON: Other than the contacts about buying the Simmons debt in November of 1985.
>
> A. Until the end of 1987. There was probably communication between Wells Fargo and the Simmons Oil and Refining -- Simmons Oil Corporation and Simmons Refining offices that would pertain to just the normal filing of tax returns and the submittal of financial information. But I believe that the only communication that I personally had with Wells Fargo was a conversation with Hardy Watford in November of 1987.

Simmons simply have not proved a fiduciary relationship between Simmons' entities and the Wells Fargo Bank existed after the creation of MRC. See Pulse v. North American Land Title Co. (1985), 218 Mont. 275, 283, 707 P.2d 1105, 1110; Diest v. Wachholz (1984), 208 Mont. 207, 678 P.2d 188; First Bank (N.A.) - Billings v. Clark (1989), 236 Mont. 195, 208, 771 P.2d 84, 92. We conclude

9

that Wells Fargo did not breach a fiduciary duty to Simmons because there was no fiduciary relationship between Wells Fargo and Simmons, after the 1984 Master Agreement.

BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

a.  Did Wells Fargo merely exercise its contractual rights or did its actions constitute a breach of the covenant of good faith and fair dealing implied in every contract?

Both parties agree that California law applies to the promissory notes at issue although the analysis would be the same under Montana law.

Simmons concedes that the 1985 restructuring agreement gave Wells Fargo the right to assign the Simmons debt, but argues that Wells Fargo's decision to assign it to Simmons' partner Holly, was subject to the implied covenant of good faith and fair dealing. Simmons contends that the sale of the notes to Holly was intentionally designed to give Holly leverage over Simmons and was not within the expectations of Simmons with respect to the 1984 master agreement or the 1985 restructuring agreement.

Although Wells Fargo agrees that the implied covenant of good faith and fair dealing applies to every contract, the bank states it cannot be used to override explicit contractual terms. Carma Developers v. Marathon Dev. Cal. (1992), 2 Cal. 4th 342, 374, 6 Cal.Rptr.2d 467, 826 P.2d 710, 728. The 1985 restructuring agreement contained language which stated: "WFB may assign this Agreement and its rights and duties hereunder." Wells Fargo contends this language gave them the right to assign Simmons' notes

10

to anyone, including Holly. "Every contract imposes upon each party a duty of good faith and fair dealing in its performance and its enforcement. . . . The covenant of good faith finds particular application in situations where one party is invested with a discretionary power affecting the rights of another. Such power must be exercised in good faith." Carma, 826 P.2d at 726. However, "[a]s to acts and conduct authorized by the express provisions of the contract, no covenant of good faith and fair dealing can be implied which forbids such acts and conduct. And if defendants were given the right to do what they did by the express provisions of the contract there can be no breach." Carma, 826 P.2d at 728. These are the principles by which we analyze whether Wells Fargo breached the implied covenant of good faith and fair dealing.

The acts and conduct authorized by express provisions of the contract at issue in Carma, above, are distinguishable from the provision at issue in the present case. Carma concerned a commercial lease which specifically provided that the landlord had the right to terminate the lease of the tenant at a fixed date after written notice from the tenant that tenant was going to assign the lease or sublease the rental premises. The lease also specifically provided the landlord may enter into a new lease for the premises with the intended assignee or sublessee or enter into a new lease with that person, and the tenant would not be entitled to any profit from the landlord due to termination of the lease and the reletting of the premises. The California Supreme Court

11

concluded that the landlord's use of this recapture clause was not a breach of the covenant of good faith since it was "expressly" permitted in the lease and was within the reasonable expectations of parties under the lease.

In the present case, the provision at issue is a general right to assign Wells Fargo's rights and duties under the 1985 restructuring agreement. (See Farris v. Hutchinson (1992), 838 P.2d 374, for a case interpreting a specific express contract similar to the contract at issue in Carma.) Simmons does not dispute Wells Fargo's right to assign its rights and duties as expressly provided for in the lease. Simmons, however, believes that it was not within their reasonable expectations that Wells Fargo's discretionary right to assign would be used to assign the notes to Simmons' partner, Holly Corporation.

This general right to assign Simmons' notes provided in the restructuring agreement must be read with another clause from the agreement. Clause 13.7 states that "[t]he parties intend and agree that each of their respective rights, duties...shall be performed...and exercised reasonably and in good faith." This clause, specifically placed in the contract at issue, provides that all rights under the contract, such as the right to assign the notes, will be conducted in good faith. This clause further supports Simmons' argument that Wells Fargo breached the covenant of good faith and fair dealing.

Simmons contends that there is still further evidence that Wells Fargo breached the covenant of good faith and fair dealing.

12

An interoffice memorandum requesting approval to sell the Simmons' notes to Holly casts doubt on Wells Fargo's intent in the sale. The applicable portion of the memorandum discusses the alternative to selling the notes to Holly and it states:

> The alternative to the above, based upon comments from Holly Corporation, would be the cessation of MRC's operation. Rather than continue funding 100% of both operating losses and required capital improvements, while receiving only 50% of any future profits, Holly Corporation has stated that it would tender its inventory guarantee to WFB and walk away. Depending upon the market value of the inventory at such time, it is questionable whether WFB would recover enough to pay off the non-accrual loan.
>   From a legal standpoint, this restructuring would take the form of WFB selling its entire creditor position in all the Simmons entities to Holly Corporation. Selling this position eliminates any need to approach Jerry Simmons or any of the Simmons entities for approval to modify the partnership agreement with respect to distributions, etc.
>   Approval of this restructuring is recommended.

A second memo reads in part:

> I spoke with Ivy Parsons of Holly Corporation this morning to get an update on Holly's progress in purchasing the Simmons's entities notes....Ivy plans to meet personally with Jerry Simmons next week and ask Mr. Simmons to sign an agreement that would waive any right of participation as a limited partner. In return for giving up any interest in the limited partnership, Mr. Simmons have (sic) his notes canceled and returned to him. This would would (sic) eliminate the risk that Holly could have a fiduciary responsibility to Jerry Simmons, and would also avoid the tax problems associated with original issue discounts.

Simmons insists that the meetings concerning the sale of the notes between Holly and Wells Fargo Bank were "secret" and that "Wells Fargo's secret negotiations with Holly, Simmons' partner, as well as its desire to change the profit distribution from the

13

refinery without Simmons' consent and to facilitate Holly's squeeze play against Simmons, all demonstrated a complete lack of honesty or commercial reasonableness." "Each party to a contract has a justified expectation that the other will act in a reasonable manner in its performance or efficient breach. When one party uses discretion conferred by the contract to act dishonestly or to act outside of accepted commercial practices to deprive the other party of the benefit of the contract, the contract is breached." Marshall v. State (1992) 830 P.2d 1250, 1251, 49 St.Rep. 336; Story v. City of Bozeman (1990), 242 Mont. 436, 450, 791 P.2d 767, 775.

The foregoing information leads the Court to believe that a genuine issue of material fact exists - whether Wells Fargo breached the covenant of good faith and fair dealing. We conclude that summary judgement on this issue was inappropriate and we reverse the District Court and remand for a proper determination.

b. Did a "special relationship" exist between Simmons and Wells Fargo to support a tort claim for bad faith?

Simmons appeals the court's decision to grant summary judgment to the defendant on the issue of tortious breach of the implied covenant, claiming that Wells Fargo and Simmons have the "special relationship" necessary to support a tort claim. The essential elements of such a relationship are:

(1) the contract must be such that the parties are in inherently unequal bargaining positions;
(2) the motivation for entering the contract must be a non-profit motivation, i.e., to secure peace of mind, security, future protection;
(3) ordinary contract damages are not adequate because;
   (a) they do not require the party in the superior position to account for its actions, and

14

(b)   they do not make the inferior party "whole";
(4)   one party is especially vulnerable because of the type of harm it may suffer and of necessity places trust in the other party to perform; and
(5)   the other party is aware of this vulnerability.

Wallis v. Superior Court (Kroehler Mfg. Co.) (1984), 207 Cal.Rptr. 123, 129.

"If substantial evidence is not presented in support of each and all of the above essential elements, the court shall direct there is no special relationship." Story, 791 P.2d at 776.

In the instant case, there is at least one element which is not supported by substantial evidence and therefore, there is no "special relationship." The second element provides that the motive for entering the contract must be non-profit. The purpose for entering into this contract is business. It is a contract between two business entities whose goals are to make money. This is nothing like the "peace of mind" which motivates insureds in insurance contracts. The appellant has not presented any substantial evidence in support of the second element necessary to establish a "special relationship," therefore, the trial court is affirmed on this issue.

## CIVIL CONSPIRACY

The final issue is whether the trial court erred in granting summary judgment as to the claims against Wells Fargo alleging civil conspiracy with Holly to breach Holly's fiduciary duty to Simmons. It is appellant's contention that during the bank's secret meetings with Holly, Wells Fargo purposefully agreed to structure the transaction in a way that "eliminates any need to

15

approach Jerry Simmons or any of the Simmons entities for approval to modify the partnership agreement with respect to distributions, etc." Moreover, Wells Fargo and Holly specifically discussed Holly's intent to use the notes to force Simmons to surrender their 50% interest in the refinery. Finally, Simmons contends that the sale of the notes to Holly promoted breaches of Holly's partnership fiduciary duty to Simmons and of Holly's obligations under the implied covenant of good faith and fair dealing.

Respondent counters that the lower court ruled that "the Holly/Navajo defendants have not committed any wrongful act", therefore, "there can be no civil action for conspiracy." If Holly committed no wrong, then there can be no conspiracy between Wells Fargo and Holly because no conspiracy claim can exist if there is not an underlying unlawful act. Duffy v. Butte Teachers' Union, Number 332, AFL-CIO (1975), 168 Mont. 246, 251, 541 P.2d 1199, 1202.

We find respondent's argument persuasive. After the lower court granted summary judgment to all defendants on all issues, Simmons appealed these decisions to the Supreme Court. Shortly thereafter, Simmons and Holly entered into a settlement agreement. Then Simmons filed a motion for voluntary dismissal of the appeal from the order of the District Court granting summary judgment for defendants Holly/Navajo. In the motion, Simmons stipulated that the judgment of the District Court, granting summary judgment to Holly, (including the civil conspiracy claim), was final and non-appealable. In a Supreme Court order dated February 25, 1992,

16

Simmons' appeal was dismissed with prejudice as to any and all further appeals of Simmons' claims against Holly, including the final judgment concerning the summary judgment motion.

The final judgment at issue (between Holly and Simmons) states that Holly committed no wrongful act. However, the necessary elements of a conspiracy include: (1) Two or more persons, and for this purpose, a corporation is a person; (2) an object to be accomplished; (3) a meeting of the minds on the object or course of action; (4) one or more unlawful overt acts; and (5) damages as the proximate result thereof. Grenz v. Medical Management Northwest (1991), 250 Mont. 58, 62, 817 P.2d 1151, 1154. "[I]f the object of an alleged 'conspiracy' is lawful, and the means used to attain that object are lawful, there can be no civil action for conspiracy. The foregoing is true even though damage may result to the plaintiffs and even though defendants may have acted with a malicious motive." Duffy, 541 P.2d at 1202. If Holly was not involved in any unlawful acts, there can be no conspiracy involving Wells Fargo either. Accordingly, the trial court did not err on the issue of Wells Fargo's involvement in a civil conspiracy with Holly/Navajo when it granted Wells Fargo's summary judgment motion.

Affirmed in part and reversed in part.

_____
Justice

We Concur:

_____
Chief Justice

17

John Conway Harrison

Karla M. Gray

Justices

Justice Terry N. Trieweiler specially concurring in part and dissenting in part.

I concur with the conclusion in the majority opinion that there was an issue of fact which precluded summary judgment dismissing Simmons' contract claim for breach of the covenant of good faith and fair dealing. I dissent from that part of the majority's opinion dismissing Simmons' tort claim for breach of the covenant of good faith for the reasons set forth in my dissenting opinion in *McNeil v. Currie* (1992), 253 Mont. 9, 830 P.2d 1241. The right to tort damages arose because of activity in Montana--not California, therefore, *Wallis v. Superior Court* (1984), 207 Cal. Rptr. 123, is not controlling, and as I have previously stated, I would not follow *Story v. City of Bozeman* (1990), 242 Mont. 436, 791 P.2d 767.

I also dissent from that part of the majority opinion which affirms the District Court's order dismissing Simmons' claim for breach of fiduciary duty. Summary judgment is an extreme remedy which should not be granted when there is any genuine issue of material fact; the procedure should never be substituted for trial if a material factual controversy exists. *Beaverhead Bar Supply, Inc. v. Harrington* (1991), 247 Mont. 117, 120, 805 P.2d 560, 562. Furthermore, all reasonable inferences that might be drawn from the offered evidence should be drawn in favor of Simmons, as the party opposing summary judgment in this case. *Cereck v. Albertson's, Inc.* (1981), 195 Mont. 409, 411, 637 P.2d 509, 511.

19

When our previous decisions which discuss the circumstances under which a fiduciary duty is established are applied to the facts in this case, I conclude that whether there was a fiduciary duty and a breach by the defendant were issues of fact to be decided by the jury. The majority opinion cites *Deist v. Wachholz* (1984), 208 Mont. 207, 678 P.2d 188, and *Lachenmaier v. First Bank Systems, Inc.* (1990), 246 Mont. 26, 803 P.2d 614, for the proposition that a fiduciary duty can only arise between a bank and its creditor when the bank fills the role of advisor to its creditor. However, it is clear from those opinions that a fiduciary duty arises when there is a special relationship between the bank and its creditor and the relationship of advisor/advisee is only one of the relationships which can create a fiduciary duty on the part of the bank.

The only thing consistent about this Court's prior decisions on this subject has been its holding that the existence of "special circumstances" may result in an exception to the general rule that a bank's relationship with its customers is not a fiduciary one. Whether or not there were special circumstances which should give rise to a fiduciary duty is a classic question of fact. In this case, Simmons contends that the degree of control exerted by Wells Fargo Bank amounts to "special circumstances." A fiduciary relationship may arise if a creditor gains substantial control over the debtor's business affairs. *Blue Line Coal Co., Inc. v. Equibank* (E.D. Pa. 1988), 683 F. Supp. 493, 496. In *NCNB National Bank of North*

20

*Carolina v. Tiller* (4th Cir. 1987), 814 F.2d 931, 936, the kind of activity which establishes a lending institution's control over a borrower was defined as "actual day-to-day involvement in management and operations of the borrower or the ability to compel the borrower to engage in unusual transactions."

The majority has concluded as a matter of law that there are no special circumstances, and therefore, no fiduciary obligation due to the fact that once the 1984 master agreement and the 1985 restructuring agreement were entered into, the bank no longer exerted daily control over Simmons' operations and direct communications between the two entities declined significantly. The majority concedes that before 1984 the bank exercised day-to-day control over nearly every facet of the refinery's operations, but seizes upon the fact that this close relationship was not evidenced thereafter. However, the following facts, which were in evidence, establish that even after the restructuring agreement and formation of the Montana Refining Company, the bank retained the ability to compel Simmons to engage in unusual transactions and continued to exert unusual control over Simmons by virtue of the terms of the agreements:

1. The 1984 master agreement (which formed the Montana Refining Company) required the bank's approval of the refinery's annual budget, and express written approval before any capital

expenditures greater than $200,000 could be made. Simmons Refining Corporation remained a limited partner in the new company.

2. Even though Simmons was a partner in the new refining company pursuant to the 1984 master agreement, and was a party to the agreement establishing the distribution of refinery cash flow, the bank could change that distribution without Simmons' consent.

3. The 1985 agreement restructured Simmons' debt through a new "carry-back promissory note" for $10 million from Simmons Refining Company to the bank, and a new "SOC promissory note" for $2.5 million from Simmons Oil Company to the bank. The new SOC note had an interest rate of 20 percent per year, almost double the prime rate. Furthermore, Simmons Refining Company was prohibited from obtaining credit from any other lender without the bank's approval. Simmons was locked into the notes and could not prepay, and was powerless to get other financing.

4. Under the terms of the 1985 agreement, the bank took complete control of Simmons Refining Company's business by prohibiting Simmons from incurring any indebtedness, liabilities, lease payments, guarantees, security interests, or any other obligations without the bank's prior written consent.

5. Also instructive is this Court's previous observation in *Simmons Oil Corporation v. Holly Corporation* (1990), 244 Mont. 75, 796 P.2d 189, to the effect that Wells Fargo's affiliation with Simmons

> extended far beyond that of the simple creditor-debtor
> relationship. Wells Fargo loaned Simmons large sums of

22

money, knowing these sums were destined for Montana. It protected its interests by exercising financial control over the refinery, retaining the authority to approve expenditures of the refinery and becoming the outright owner of Simmons' profits from the refinery.

. . . .

. . . The sale of debt, the act that constituted Wells Fargo's alleged breach of duty, was merely the final act in the chain.

*Simmons*, 796 P.2d at 196.

These examples demonstrate that the bank actively assumed a relationship far beyond the usual debtor-creditor relationship. During the period of time that the majority states there were no "direct contacts" between Simmons and bank personnel, the evidence establishes that the bank still exerted control over Simmons. Simmons was powerless to get other financing without the bank's approval; it was locked into a note that could not be prepaid; and the bank continued to control the annual budget and expenditures for the refining company in which Simmons was a limited partner. A jury could properly find a type of "special relationship" which gave rise to a fiduciary obligation from the bank to Simmons. Based on these facts, this issue cannot be resolved by summary judgment.

For the same reasons that the majority concluded there was evidence sufficient to support a claim for breach of the covenant of good faith, I conclude there was also evidence to support a claim that the bank breached its fiduciary duty to Simmons. I

23

would remand to the District Court for a jury trial on Simmons' claim that the bank breached its fiduciary duty.

I also dissent from the majority's conclusion that because Simmons settled its claim against Holly Corporation and dismissed its appeal against that defendant, Simmons is precluded from pursuing its claim for civil conspiracy against the bank.

There was nothing about Simmons' settlement with Holly Corporation which resolved the merits of that claim. Furthermore, settlement of claims is presumed to be in the best interests of the parties, the courts, and the Montana public. *State ex rel. Deere v. District Court* (1986), 224 Mont. 384, 730 P.2d 396. Settlement of claims should be encouraged by this Court, not discouraged. Yet, the majority opinion will make it impossible for a plaintiff to settle with one of two tort feasors under similar circumstances in the future.

Based on this decision, future defendants like Holly Corporation will simply have to continue to be involved in the litigation and incur the attendant expenses so long as Simmons is unable to resolve its differences with some other alleged co-conspirator. Defendants like Holly Corporation will have absolutely no control over their own destiny because no future plaintiff will be able to settle a claim with one defendant until the case has been resolved against all defendants. This is bad

24

public policy and serves no rational purpose under the circumstances in this case.

For these reasons, I dissent from the majority opinion. I would remand the issues of breach of fiduciary duty and civil conspiracy to the District Court for resolution of the factual issues that have been raised by the evidence that is already in the record.

_____
Justice

Justice William E. Hunt, Sr., concurs in the foregoing concurrence and dissent of Justice Trieweiler.

_____
Justice

25

April 29, 1993

## CERTIFICATE OF SERVICE

I hereby certify that the following order was sent by United States mail, prepaid, to the following named:


H.CHARLES STAHMER
Attorney at Law
502 S. 19th Ave., Suite 11
Bozeman, MT  59715

James Goetz
Goetz, Madden & Dunn
35 N. Grand
Bozeman, MT  59715


Charles J. Wisch
WEISSBURG & ARONSON, INC.
555 California st., Suite 2400
San Francisco, CA  94104

Steven M. Perry, Esq.
MUNGER, TOLLES & OLSON
355 S. Grand St., 35th Floor
Los Angeles, CA  90071-1560

Richard F. Gallagher, Esq.
CHURCH, HARRIS, JOHNSON & WILLIAMS
P.O. Box 1645
Great Falls, MT  59403

John D. Stephenson, Esq.
JARDINE, STEPHENSON, BLEWETT & WEAVER
P.O. Box 2269
Great Falls, MT  59403

*ED SMITH*
CLERK OF THE SUPREME COURT
STATE OF MONTANA