No. 95-029

IN THE SUPREME COURT OF THE STATE OF MONTANA

1998 MT 129

SIMMONS OIL CORPORATION,

Plaintiff and Appellant,

v.

WELLS FARGO BANK, N.A.,

Defendant and Respondent.

APPEAL FROM:    District Court of the Eighth Judicial District,
In and for the County of Cascade,
Honorable Roy C. Rodeghiero, Judge Presiding.

COUNSEL OF RECORD:

For Appellant:

H. Charles Stahmer (argued), Stahmer Law Offices, Bozeman,
Montana

James Goetz (argued), Goetz, Madden & Dunn, Bozeman,
Montana

Charles J. Wisch, Law Offices of Charles J. Wisch, San
Francisco,California

For Respondent:

Dennis C. Brown (argued), Allison B. Stein and Marsha
Hymanson,
Munger, Tolles & Olson, Los Angeles, California

John D. Stephenson, Jardine, Stephenson, Blewett & Weaver,

Great Falls, Montana

```
                         Heard:   February 11, 1997
                      Submitted:   March 25, 1997
                        Decided:   May 28, 1998
                          Filed:
```

_____
Clerk

Honorable John W. Larson, District Judge, delivered the Opinion of the Court.

Appellant Simmons Oil Corporation (hereinafter Simmons) appeals trial and post-trial rulings from a November 1993 jury verdict which awarded it $2,238,743.00 against defendant Wells Fargo Bank (hereinafter Wells Fargo). This Court has expressly permitted Wells Fargo to appeal the denial of its request for attorney fees as a sanction against Simmons for pursuing a Rule 60(b), M.R.Civ.P., motion during this appeal. We affirm the District Court.

Simmons presents the following issues on appeal:

1. Whether the District Court erred when it denied Simmons' motion in limine concerning Wells Fargo's expert testimony of refinery value;

2. Whether the District Court erred when it instructed the jury to disregard testimony by Simmons' damage expert, Don Knudsen, concerning defendant Holly Corporation's (hereinafter Holly) analysis of a sulphur reduction unit at the Black Eagle Refinery (Exhibit 73);

3. Whether the District Court erred when it refused Exhibit 73--a Holly budget document analyzing the projected profits of the sulphur reduction unit at the Black Eagle Refinery;

4. Whether the District Court erred when it refused Simmons' motion for new trial on damages;

5. Whether the District Court erred when it calculated the set-off for the earlier settlement with a former co-defendant, Holly;

6. Whether the District Court erred when it refused Simmons' post-trial request for attorney fees.

With the express permission of this Court, Wells Fargo presents the following issue on appeal from our remand to the District Court:

7. Whether the District Court erred when it refused Wells Fargo's request for attorney fees as sanctions for Simmons' Rule 60(b), M.R.Civ.P., motion.

Procedural and Factual History

11 This is the third appeal stemming from the sale of Simmons' debt by Wells Fargo to Simmons' partner and former co-defendant, Holly. Simmons alleged in its complaint that when Wells Fargo sold the Simmons' debt to Holly, Wells Fargo knew Holly wanted to acquire sole ownership of the Black Eagle Oil Refinery jointly owned by a Simmons/Holly partnership. At the time of the sale to Holly, Simmons had also offered to purchase this debt. Wells Fargo refused and instead sold the debt to Holly. Holly foreclosed the debt and Simmons lost its interest in the refinery.

12 Simmons filed this case in December 1988, against Holly and two of its subsidiaries and Wells Fargo. In May 1989, the District Court granted Holly's and Wells Fargo's motions to dismiss for lack of personal jurisdiction. This ruling was reversed in Simmons Oil Corp. v. Holly Corp. (1990), 244 Mont. 75, 796 P.2d 189 (Simmons I).

13 Holly and Wells Fargo were granted summary judgment in October 1991. In a settlement prior to this Court's decision on the appeal of the summary judgment, Simmons Oil Corp. v. Holly Corp. (1993), 258 Mont. 79, 852 P.2d 523 (Simmons II), Holly paid Simmons cash and a promissory note worth $3.5 million and forgave notes of $18 million in return for stock of Simmons and dismissal from the action.

14 Pursuant to the opinion in the second appeal, a jury trial was held November 1-12, 1993, on the issue of breach of the implied covenant of good faith and fair dealing. The jury awarded Simmons $2,238,743.00. Extensive post-trial activity followed. First, Simmons requested and received court approval for the deposition of Leland Griffin based on the allegation that Wells Fargo's expert had committed perjury. Next, Simmons sought a new trial based on the alleged perjury of Mr. Capers. Wells Fargo then moved for entry of judgment with a verdict of $0.00 in view of the Holly settlement which it contended had a present value of $3.5 million. Simmons opposed the motion and sought in excess of $900,000.00 in attorney fees and costs.

15 Simmons' motions for new trial and attorney fees were denied in December 1994. The District Court then calculated the set-off for the Holly settlement and entered judgment for Simmons against Wells Fargo for $0.00 plus costs of $25,536.94. Simmons filed its Notice of Appeal, and briefing to this Court commenced.

16 During the briefing, Simmons raised an issue concerning new evidence affecting the value of the contingency note which was part of the settlement between Simmons and Holly. This Court issued an order on January 4, 1996, remanding the matter back to the District Court for consideration of the issue under Rule 60(b), M.R.Civ.P., and suspending the appeal process pending the District Court's consideration of the issue. In May 1996 the District Court denied the Rule 60(b), M.R.Civ.P., motion, as well as a subsequent request by Wells Fargo for sanctions (attorney fees). Following the District Court ruling on May 1, 1996, this Court issued a supplemental briefing order on May 30, 1996. In Simmons' brief filed pursuant to that order, Simmons withdrew from the appeal the Rule 60(b), M.R.Civ.P., issue of the valuation of the

contingency note. However, Wells Fargo preserved for appeal its request for attorney fees from Simmons as sanctions for Simmons' Rule 60(b), M.R.Civ.P., motion.

### Standard of Review

17 We review a district court's rulings on evidentiary issues for an abuse of discretion. In Re Matter of Seizure of $23,691.00 (1995), 273 Mont. 474, 905 P.2d 148; Hansen v. Hansen (1992), 254 Mont. 152, 160, 835 P.2d 748, 753; Cech v. State (1979), 184 Mont. 522, 604 P.2d 97. The question is not whether this Court would have reached the same decision, but, whether the district court abused its discretion in reaching the decision to deny admissibility. Ingraham v. State (Mont.1997), 945 P.2d 19, 54 St.Rep. 782. An abuse of discretion occurs when a district court acts arbitrarily without conscientious judgment or exceeds the bounds of reason. Investigation Records of City of Columbus Pol. Dept. (1995), 272 Mont. 486, 488, 901 P.2d 565, 567.

18 This standard also applies to the denial of a motion for new trial based on evidentiary rulings and further requires the abuse of discretion "must be so significant as to materially affect the substantial rights of the complaining party." Hansen, 835 P.2d at 753.

19 As to relevancy issues, the district court has broad discretion to determine whether or not evidence is relevant and admissible. State v. McKeon (Mont. 1997), 938 P.2d 643, 54 St.Rep. 404, citing State v. Oatman (1996), 275 Mont. 139, 143-44, 911 P.2d 213, 216. Relevance is determined based on whether the evidence logically or based on experience has any value in proving the proposition for which it is offered. Oatman, 911 P.2d at 216, citing State v. Oman (1985), 218 Mont. 260, 264, 707 P.2d 1117, 1119. Further, the weighing of potential prejudice against probative value will also be upheld unless the district court committed an abuse of discretion. Oatman, 911 P.2d at 216, citing State v. Laird (1987), 225 Mont. 306, 312, 732 P.2d 417, 421.

20 1. Did the District Court err when it denied Simmons' motion in limine concerning Wells Fargo's expert testimony of refinery value?

21 Simmons sought in its motion in limine to preclude J. David Capers from testifying concerning refinery value. Simmons argues that Capers' testimony was not relevant to the issue of Simmons' damages. Simmons also argues the valuation testimony offered by Capers was misleading and confusing to the jury because Simmons was seeking lost partnership cash flow, not the value of the facility. Wells Fargo responds that its expert, Capers, did testify to the cash flow and capital improvement needs as well as a market value analysis. Further, Capers testified to a different discount rate than that testified to by Simmons' damage expert, Knudsen.

22  After review of Capers' testimony and noting that it was not adopted by the jury, and, that it did address cash flow and capital improvement issues--also addressed by Simmons' expert--we do not find the District Court abused its discretion by denying Simmons' motion in limine.  Alternative approaches to measure loss are within the meaning of Rule 401, M.R.Evid.  It is up to the jury to decide which is more or less probable as a measure of loss.  Here, the jury did not accept Capers' testimony concerning valuation, and, thus, the evidentiary ruling by the District Court does not constitute a manifest abuse of discretion.

23  2.    Did the District Court err when it instructed the jury to

disregard testimony by Simmons' damage expert, Don Knudsen, concerning Holly's analysis of a sulphur reduction unit at the Black Eagle Refinery (Exhibit 73)?

24  During trial, the court admonished the jury "to disregard the testimony regarding the profits expected from the instrument referred to that is not yet in evidence."  (Emphasis supplied.)  Simmons argues this instruction from the court was reversible error because under Rule 703, M.R.Evid., experts may rely on matters which are not admissible evidence.  In this instance, Wells Fargo submits that Simmons' expert, Knudsen, did not include the sulphur reduction unit in his cash flow analysis and, thus, such testimony was outside the exception provided for in Rule 703, M.R.Evid.  Simmons counters that Wells Fargo opened the door when it examined Knudsen about the sulphur reduction unit during cross-examination and that it should have been permitted to ask about the issue as well.  The prejudice Simmons points to is that had this testimony been brought out, an additional $25 million in lost income could have been argued to the jury.

25  In response, Wells Fargo notes that the admonition of the court related only to testimony concerning the document, Exhibit 73, and that testimony concerning the additional $25 million in damages was elicited later in the trial by Simmons on redirect of Knudsen and not objected to by Wells Fargo.

26  The abuse of discretion standard controls this evidentiary determination as well.  Here, given the fact the District Court had refused the admission of the Holly document, Exhibit 73, it was not an abuse of discretion for the court to direct the jury to disregard testimony concerning that document.  Further, the evidence of the $25 million cash flow loss was elicited without reference to the document and not objected to.  Thus, the additional $25 million in lost profit was available to Simmons for jury argument.  Accordingly, the District Court did not abuse its discretion on this issue.

27  While the dissent urges the absence of a record concerning the expected future profit from the sulphur reduction unit, the following question and answer occurred immediately after the court's instruction to the jury:
Q    [By Mr. Wisch]:  Sir, can you calculate for us, please,

and tell us what $3.6 million times 16 years is?

A    [By Mr. Knudsen]:  It would be just over $58 million.

28    Thus, the jury had before it without objection the annual profit of the desulfurization unit over its estimated useful life as well as the total profit, of which Simmons would have been entitled to half.  It was a decision by Simmons' counsel not the District Court which kept this figure from final argument to the jury.

29    3.    Did the District Court err when it refused Exhibit 73--a Holly budget document analyzing the profits of the sulphur reduction unit at the Black Eagle Refinery?

30    The arguments presented on Issue No. 2 also apply to this issue.  In addition, Wells Fargo argues that Rule 703, M.R.Evid., while allowing the expert to rely on inadmissible evidence, does not permit the inadmissible evidence to come in unless it can rely on a separate exclusion to the hearsay rule.  Simmons cites Rule 106, M.R.Evid., the rule of completeness, as a basis for admitting the entire document.  Wells Fargo argues in response that Rule 106 is not an additional exception to the hearsay rule.  Given the lack of reliance on the issues or document by Simmons' expert in his opinion of lost cash flow and the availability of the increased cash flow figures, for jury argument, it was not an abuse of discretion for the District Court to deny the admissibility of Exhibit 73.  Rule 106, M.R.Evid., does not authorize admission of otherwise inadmissible hearsay.  State v. Campbell (1978), 178 Mont. 15, 582 P.2d 783.

31    Even considering the views of the dissent, application of Rule 703, M.R.Evid., to Exhibit 73 does not support admissibility.  Knudsen's approach to valuation was to calculate historic cash flow which by definition would exclude a future profit projection such as Exhibit 73 from consideration.

32    Notwithstanding his expert's methodology, Simmons' counsel persisted in eliciting testimony relative to the desulfurization unit, including the amount of annual expected profit, total useful life, and total anticipated profit to the partnership without reference to the exhibit and without objection from Wells Fargo.  Given the fact the record contained the essential features of Exhibit 73, the District Court did not indulge in an abuse of discretion for not admitting it under the completeness doctrine.  Rule 106, M.R.Evid.  Additional damage calculations were available but not argued to the jury based solely on trial strategy adopted by Simmons' counsel.

33    4.    Did the District Court err when it refused Simmons' motion for new trial on damages?

34 Simmons argues a new trial should have been granted by the District Court based upon alleged false testimony offered by Wells Fargo's expert, Capers. Simmons contends that its expert testified that the income should include an additional $25 million from the sulphur reduction unit which Holly calculated the unit would yield following its construction. Simmons contends that Wells Fargo's expert, Capers, testified falsely concerning the operational status of the sulphur reduction project during his latest visit and that his calculations had been verified by Griffin, the refinery manager. Simmons supports its position with statements obtained from Capers in a post-trial deposition wherein Capers revealed that the reduction unit was operating at a reduced capacity and that Griffin did not confirm this calculation of additional annual income. Simmons contends that Griffin would have supported the additional $3.6 million in additional income. Simmons also contends that Wells Fargo's counsel falsely represented that Griffin was out of town during trial. Simmons argues these statements were false and constituted perjury which should justify a new trial.

35 Wells Fargo counters that Capers only testified that the sulphur reduction unit was not fully operational and that Griffin had confirmed that such an operational status would have a negative impact on income. Wells Fargo also argues that its expert, Capers, did not represent Griffin's position as argued by Simmons, but instead was precluded from testifying because of a hearsay objection by Simmons. Wells Fargo suggests additional cross-examination by Simmons would have clarified these matters and that a new trial is unwarranted.

36 Again, the abuse of discretion standard of review governs this Court's consideration of the denial of a new trial. Morris v. Corcoran Pulpwood Co. (1970), 154 Mont. 468, 465 P.2d 827. The District Court decision on Capers' alleged false testimony about the sulphur reduction unit and its operational status cannot be said to be an abuse of discretion. Again, the lack of reliance by Simmons' damage expert on any additional income from the sulphur reduction unit, together with the testimony of the estimated income from the sulphur reduction unit and impact of cash flow over the period ($25 million)--which was not objected to and available for argument to the jury by Simmons--lead us to the conclusion that it was Simmons' trial strategy, not the District Court ruling, which kept these matters from being fully developed or argued to the jury.

37 5. Did the District Court err when it calculated the set-off for the Holly settlement?

38 The Pretrial Order provides that Simmons' loss (verdict) would "be offset against the funds plaintiffs have and will receive from Holly for the sale of the refinery." Simmons argues that the loss in value of Simmons' stock--Simmons Refining Company and Simmons Oil Company--should be taken into account in implementing the settlement, rather than simply the dollar-for-dollar set-off of cash ($3.5 million) against the $2.2 million verdict. Wells Fargo responds that the loss in value of any stock is alternative but not cumulative damage suffered by Simmons and that Simmons can only recover

once for a loss.

39 Given the theory of loss advanced by Simmons (cash flow) and the above provision in the Pretrial Order, this Court cannot find the District Court abused its discretion by setting-off dollar-for-dollar the Holly settlement against the verdict received by Simmons.

40 6. Did the District Court err when it refused Simmons' post-trial request for attorney fees?

41 Simmons sought approximately $900,000 in attorney fees, post-trial, based upon the request by Wells Fargo for attorney fees in its pleadings. It is undisputed that the Pretrial Order contained no reference to attorney fees. There is also no indication that the issue of attorney fees was raised during trial. Under 28-3-704, MCA, Simmons argues that attorney fees should be reciprocal and awarded. Wells Fargo cites Naftco Leasing v. Finalco, Inc. (1992), 254 Mont. 89, 835 P.2d 728, as controlling when attorney fees are not contained or implicit in the pretrial order. Again, we cannot find the District Court abused its discretion by denying the request since it was not contained in the Pretrial Order, and, thus, not before the court. Nentwig v. United Industry, Inc. (1992), 256 Mont. 134, 845 P.2d 99; Ducham v. Tuma (1994), 265 Mont. 436, 440, 877 P.2d 1002, 1005.

42 7. Did the District Court err when it refused Wells Fargo's request for sanctions (attorney fees) based on Simmons' Rule 60(b), M.R.Civ.P., motion?

43 Following the January 4, 1996, remand order for consideration of Simmons' request under Rule 60(b), M.R.Civ.P., Wells Fargo sought sanctions against Simmons for its motion. The District Court's order of May 1, 1996, did not specifically address the attorney fees which are deemed denied. Simmons has not pursued the ruling on the underlying motion in this appeal; however, Wells Fargo persists in seeking sanctions.

44 Awards of attorney fees in Montana must be based on statutory or contractual authority. Goodover v. Lindeys Inc. (1992), 255 Mont. 430, 843 P.2d 765 (citing authority). There is also an equitable exception for frivolous litigation providing for attorney fees. Foy v. Anderson (1978), 176 Mont. 507, 511-12, 580 P.2d 114, 116-17.

45 Here, while we do not have an express reason in the District Court order of May 1, 1996, for the denial of Wells Fargo's motion, we also do not have specific statutory contractual or rule authority for the award of attorney fees. In addition, Simmons did prevail in its case against Wells Fargo and nothing in the court order of May 1, 1996, indicates the specific motion at issue was frivolous.

46   Based on the foregoing, we cannot say it was error or an abuse of discretion for the District Court to deny Wells Fargo's request for attorney fees.

47   Affirmed.

                              /S/ JOHN W. LARSON
                              Honorable John W. Larson,
District Judge,
                              sitting in place of Justice
James C. Nelson


We concur:


  /S/  J. A.  TURNAGE

/S/  KARLA M. GRAY

/S/  W. WILLIAM LEAPHART

/S/  JIM REGNIER
Justice Terry N. Trieweiler dissenting.

48   I dissent from the majority's decision to affirm the judgment of the District Court.  I conclude that based on erroneous evidentiary rulings, in combination with false testimony offered by Wells Fargo's expert witness, the plaintiff, Simmons Oil Corporation, was denied a fair trial on the issue of damages, and that a new trial limited to the issue of damages should, therefore, have been granted.

49   To fully understand the impact of the District Court's evidentiary rulings and the false testimony of J. David Capers, it is necessary to consider the evidence more carefully than is done in the majority opinion.

50   It was Simmons' contention that because of Wells Fargo's sale of its promissory notes to Holly Corporation, Holly was able to foreclose on the stock of Simmons Refining Company (a wholly owned subsidiary of Simmons Oil Corporation) and acquire one hundred percent ownership of the Black Eagle Refinery.  Simmons' claim for damages was based on its contention that because of the loss of its partnership interest in the refinery, it lost a fifty percent share of the cash flow that had been produced by the refinery and would be produced in the future.  Simmons attempted to prove the value of that loss through the testimony of Don Knudsen, a certified public accountant who had extensive experience working with oil industry partnerships. Knudsen arrived at his estimation of lost partnership income by analyzing financial statements derived from the refinery operation during the period from

January 1, 1988, through August 31, 1993 (trial occurred in November 1993). He then made the required adjustments to arrive at cash flow figures during that time and projected cash flow figures after that date because, pursuant to the partnership agreement, partnership distributions were based on actual cash flow.

51 Based on an assumption that the partnership would have operated the refinery for at least another twenty years (the partnership agreement provided for operation for a period of fifty years), he estimated that Simmons' loss of past and future partnership income had a value of between $53.5 and $59 million.

52 Wells Fargo objected to Knudsen's testimony on the basis that it was speculative for the reason that no one from the refinery had testified that future performance would reflect past performance. Although that objection was overruled, Knudsen was then cross-examined extensively about whether he had adequately considered the cost of capital improvements which would be necessary in the future. He testified that his projections were based on the assumption that future capital improvements would be paid for from additional profits and used the refinery's projections for its new sulphur reduction facility as an example. He explained that based on the capital budget worksheet prepared for the Montana Refining Company on October 1, 1992, the sulphur reduction facility would require an investment of $10.7 million, but that from that investment the company anticipated a net return of $3.6 million per year over a period of sixteen years.

53 His assumption that income from capital improvements would exceed capital expenditures was challenged by Wells Fargo's attorney, and he was asked to point out where, in any of the company's projections, his estimates were corroborated. At that point, the company's capital budget worksheet for the sulphur reduction unit was marked as Exhibit No. 73 for identification and was discussed at length by Knudsen at the insistence of Wells Fargo's attorney. He was asked to relate from the document the actual cost of the alkylation unit. He was asked to refer to the document and relate to the jury the cost of the sulphur reduction unit, and finally, he was asked during cross-examination why he did not consult with employees of Holly Corporation when arriving at his estimate of future lost income. He explained it had not been necessary because he had relied on their budgets and their projections for cash flow from capital improvements, such as reflected in Exhibit 73.

54 Counsel for Wells Fargo repeatedly attempted to impeach Knudsen's projections of future lost income by pointing out that more would have to be spent on capital improvements than he had projected and by suggesting that the cost of needed capital improvements would exceed anticipated revenue. Exhibit 73 was critical to Knudsen's contention that the major capital improvement, the sulphur reduction unit, would not only pay for itself, but increase net income. However, after cross-examining Knudsen extensively regarding the effect of future capital improvements and, in particular, the sulphur reduction unit, and after referring extensively to Exhibit 73 which corroborated Knudsen's opinions, Wells Fargo not only objected to the admission of Exhibit 73, but moved to strike Knudsen's testimony which was based on the figures which the document included. After listening to the

arguments about the document's admissibility, the District Court instructed as follows:  "The jury is to disregard the testimony regarding the profits expected from the desulphurization unit from the instrument referred to that is not yet in evidence."

55  The logical meaning of the court's instruction was that the jury was not to consider any evidence of the company's projected profits from its investment in the sulphur reduction unit over the next sixteen years, since all of that testimony was based directly or indirectly on the excluded worksheet.

56  It is not correct, as stated in the majority opinion, that evidence of the anticipated future profit from the sulphur reduction unit was admitted for the jury's consideration without regard to Exhibit 73.  All of Knudsen's testimony regarding the company's projected future profit from the sulphur reduction unit was based on his examination of Exhibit 73 and the jury would logically have inferred from the court's instruction that none of his testimony in that regard was to be considered.

57  Neither is the majority opinion correct when it states, in relation to Issue 3, that Knudsen did not rely on Exhibit 73 in arriving at his opinions.  His projection of the company's future cash flow, which was the basis of Simmons' claim for damages, was based in large part on his assumption that future capital expenditures would be paid for by the increased income which resulted from those expenditures.  His assumptions were, in large part, based upon the company's own projections, as illustrated by Exhibit 73.  That corroboration was essential to the plaintiff's case in light of the defense's arguments to the contrary, and its criticism that he had not consulted personnel from the refining company.

58  Furthermore, both Exhibit 73 and Knudsen's testimony, which was based on that exhibit, were admissible pursuant to the Montana Rules of Evidence.  Rule 106, M.R.Evid., provides, in relevant part, that:

> (a)  When part of . . . [a] writing . . . is introduced by a party:
>
> (1)  an adverse party may require the introduction at that time of any other part of such item or series thereof which ought in fairness to be considered at that time; or
>
> (2)  an adverse party may inquire into or introduce any other part of such item of evidence or series thereof.

59  When Knudsen was cross-examined by Wells Fargo's attorneys from Exhibit 73 in an effort to demonstrate that the refining company anticipated substantial future expenditures for capital improvements, Simmons was entitled to offer all of Exhibit 73 to demonstrate that it was the refining company's expectation that increased income from the capital improvements would exceed their cost and provide a substantial long-term net profit.  To permit the negative inference that was produced by the cross-examination without the positive information that was included in the same document was simply unfair.

60 In addition, Rule 703 provides:

The facts or data in a particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. If of a type reasonably relied upon by experts in a particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence.

61 Knudsen was entitled to base his opinion about future refining company cash flow on the company's own business records and projections. A proper foundation was laid during the course of his testimony for him to do so. Therefore, when the District Court instructed the jury that it was not to consider Knudsen's testimony regarding profits expected if based on Exhibit 73, the District Court erred and its instruction was extremely prejudicial to the plaintiff's theory of damages.

62 The impact of these evidentiary rulings was compounded by the nature of evidence offered by Wells Fargo. The defendant attempted to disprove Simmons' claim of lost future income through the testimony of its expert, J. David Capers.

63 Capers is a chemical engineer with extensive experience in the oil refining industry. For a fee of over $40,000, he testified that the total present value of the refinery was about one-fourth of the net income that the refinery had generated during the previous year, and only twice what the refinery had generated as net income in the two months immediately preceding trial.

64 Capers testified that the refining company was unlikely to produce income in the future similar to what had been produced in the past because of capital expenditures he anticipated would be necessary and which, in his opinion, greatly exceeded the cost estimated by Knudsen. He testified that even after the sulphur reduction unit was complete, he anticipated that profits would decline by $3 million annually due to its additional cost.

65 In sum, Capers testified that a refining operation which had been in existence for sixty years, which according to the partnership agreement had a life expectancy of another fifty years, and which during the previous five and one-half years had produced net income of $28

million, had a present value of only $2.2 million.  However, one of the principal bases for his opinion was that the necessary capital expenditures, including the cost of the sulphur reduction unit, would greatly exceed any additional income that could be expected to result from those expenditures.  Because the defendant made that argument and simultaneously inferred that the plaintiff's expert had not taken into consideration the mining company's own projections in this regard, Exhibit 73, which was proof to the contrary, was especially critical.  Simmons was prejudiced by the District Court's refusal to admit it, and further prejudiced by the District Court's instruction to the jury that it should not consider any testimony of the plaintiff's expert which was based on that document.  For these reasons alone, I would reverse the judgment of the District Court and remand this case for a new trial limited to the issue of damages.

66  However, I also disagree with the majority's conclusion that Simmons was not prejudiced by Capers' false testimony regarding his conversation with Leland Griffin.

67  It was Simmons' position that it had lost future income as a result of its loss of its partnership interest in the refining company.  A basis for its expectation of future income was its contention that future capital expenditures would increase income in an amount greater than the expenditure.  The refining company's projections for the sulphur reduction unit corroborated Simmons' position.

68  It was Wells Fargo's position, on the other hand, that due to new regulations capital expenditures, such as those for the sulphur reduction unit, would be greater than future income and reduce the likelihood of any future profit.

69  Leland Griffin was the manager of the Montana Refining Company.  He was involved in the preparation of a proposal to install the sulphur reduction units and had prepared the "Montana Refining Company Capital Budget Worksheet" which related to those units and had been marked as Exhibit 73.

70  During his examination, Capers testified that he had consulted with Griffin and clearly inferred that Griffin confirmed his opinion that no net profit would result from construction

of the new units.  He also testified that he had visited the refining plant the day prior to his testimony, that the sulphur reduction unit was not yet operational, and that to make it operational would require substantial additional expense which would consume any additional profit the company could expect during that year and the following year.

71  When asked if he did anything to verify whether his pessimistic calculations were correct, as opposed to those that had been made by the company, he answered:

> Yes, I interviewed a fellow named Mr. Leland Griffin.  Mr. Griffin was the originator of the AFE for the sulphur reduction unit.  He was the one that proposed that to the board.  He did many of the calculations that related to the unit itself.  He even did some of the design work on some of the equipment that was going to be put in.

> When I interviewed him, he was the refinery manager over across the river.  And I had a chance to ask him about this discrepancy that I kept running into when I calculated things.  And what he did is confirm . . . .

72  At that point, there was an objection made to Capers' testimony on the basis that he was about to relate hearsay.  The plaintiff's attorney argued that if defendant wanted testimony from Griffin, he should be called as a witness.  The court and plaintiff's attorneys were advised by defense counsel that Griffin was not available.  When the parties returned to the courtroom, the examination of Capers continued.  He was asked if, when he visited the refinery, he learned anything that caused him to change his assessment that the refinery's estimated profits could not be achieved.  He stated:  "I learned nothing to change that opinion."

73  He then gave the following answers in response to the following questions:

Q.   And did you receive any confirmation of your opinion?

A.   Yes, I did.

Q.   And did anybody -- did you find -- did anybody there disagree with your assessment?

A.   No, ma'am.

74  This testimony, in combination with his previous testimony that he had interviewed

Griffin, the very author of the refinery's projections, definitely inferred to the jury that Griffin repudiated his own projection and supported Wells Fargo's theory that no or little net income could be anticipated in the future. On top of that, the court was advised by Wells Fargo's attorney that Griffin was unavailable.

75 However, subsequent to trial, Griffin was located by the plaintiff's attorney and his deposition was taken. He testified that the sulphur reduction units were constructed to give the refinery the ability to reduce the percentage of sulphur in diesel fuel and to reduce sulphur emissions from the refinery in order to conform to the Clean Air Amendment of the 1990 EPA Act. He testified that the company anticipated an investment of $10,750,000, but that investment would be recovered in 3.83 years based on anticipated profit from the operation of the unit, and that they hoped to have a net return from the unit of $3,633,000 per year for a period of time that could exceed sixteen years.

76 Griffin testified that although he had met with Capers in September, he did not recall Capers disputing his projections during that conversation, and that if Capers had advised him that he disagreed with his projection, he would have disagreed with Capers. He testified that he was also present and working at the refinery on Tuesday, November 9, 1993, the day before Capers testified, and that he had not been contacted by Capers at anytime on that date, nor to his knowledge, had Capers come to the premises on that date.

77 Griffin also testified that contrary to Capers' representations, the desulphurization unit was operational on November 9, 1993, and was producing 1500 barrels of low sulphur diesel fuel per day. He also stated that he had been available to testify during the week of November 8, 1993 (the week during which counsel for Wells Fargo said he would be unavailable), but that no one from Wells Fargo had contacted him during that week. He did acknowledge that he had anticipated being gone that week and had made that known to Wells Fargo's attorneys sometime prior to that week.

78 Capers' testimony was false in many critical respects. He testified that a sulphur reduction unit was necessary because of federal regulations which became effective on October 1, 1993, and which required that diesel fuel have a decreased percentage of sulphur.

He testified that as of November 9, 1993, the refining company had no operational sulphur
reduction unit, was therefore in a bind to operate, and that the future investment necessary
to complete the unit would exceed any additional income that the unit could be expected to
generate.  He testified that the company's earlier projections of a profit from the sulphur
reduction unit were in error, and that that error had been confirmed by the very person who
was in charge of constructing the unit and who had projected the profit--Leland Griffin.

79  Other than the fact that a sulphur reduction unit was necessary, none of what Capers
said was true.  He had not been on the plant premises the day before his testimony, nor had
he talked to Griffin on that date.  The sulphur reduction unit was partially operational at the
time that he testified, and Griffin did not agree with Capers' conclusion that the sulphur
reduction unit would not be profitable.  However, plaintiffs were hampered in their effort to
rebut Capers' misstatements when Wells Fargo's attorney represented that Griffin was
unavailable as a witness.  Whether that representation was innocent or otherwise is
irrelevant.  The effect was the same.

80  These circumstances present grounds for a new trial that are squarely within the
anticipation of   25-11-102(4), MCA, which provides that a new trial may be granted for
"newly discovered evidence material for the party making the application which he could
not, with reasonable diligence, have discovered and produced at the trial."

81  The majority opinion dismisses this issue for the same reason that it dismissed the
previous two issues by simply concluding that because Simmons' damage expert did not rely
on additional income from the sulphur reduction unit, and because there was testimony about
the income from the sulphur reduction unit, the District Court did not abuse its discretion.
However, the majority opinion is incorrect.  The projected income from the sulphur
reduction unit corroborated Simmons' contention that there would be future cash flow from
which partners would be paid.  It was even more critical in light of Wells Fargo's contention
during cross-examination that capital expenditures would exceed future income.  Finally,
there was no testimony from which the jury could consider cash flow from the sulphur
reduction unit because the District Court instructed the jury to disregard any testimony

derived from Exhibit 73.  All testimony related to future cash flow from the sulphur reduction unit, except for Capers' misrepresentations, was derived from Exhibit 73.

82  For these reasons, I also conclude that the District Court erred when it denied Simmons' motion for a new trial based on Capers' misrepresentations.  I conclude that the inaccuracy of that testimony could not have been known during trial based upon defendant's representation that Griffin was unavailable, and that Griffin's subsequent testimony was newly discovered material evidence which justified a new trial limited to the issue of damages.

83  The cumulative effect of the District Court's exclusion of Exhibit 73 and Capers' false testimony was to completely distort the refining company's prospects for future profit and, therefore, minimize the likelihood of future cash flow from which Simmons had a right to be paid.  As a result, the jury's verdict was totally inconsistent with the company's past earnings history and the only credible evidence of its prospects for future earnings.

84  The only way to correct these errors is to vacate the judgment of the District Court and remand this case to that court for retrial limited to the issue of damages.  For these reasons, I dissent from the majority opinion.

/S/   TERRY N. TRIEWEILER

Justice William E. Hunt, Sr., joins in the foregoing dissenting opinion.


/S/   WILLIAM E. HUNT, SR.