No. 88-326

IN THE SUPREME COURT OF THE STATE OF MONTANA

1989

MONTANA BANK OF CIRCLE, N.A., a corporation,

     Plaintiff and Counterdefendant and Respondent,

  vs.

RALPH MEYERS & SON, INC., a corporation, and
KEITH MEYERS,

     Defendants, Counterplaintiffs and Third-Party
     Plaintiffs, and Appellants.


APPEAL FROM:  The District Court of the Seventh Judicial District,
             In and for the County of McCone,
             The Honorable Dale Cox, Judge presiding.


COUNSEL OF RECORD:

     For Appellant:

James A Patten; Patten Law Firm, Billings, Montana

     For Respondent:

Kyle A Gray; Holland & Hart, Billings, Montana
James M. Ragain; Holland & Hart, Billings, Montana

Submitted:    February 3, 1989

Decided:    February 23, 1989

Clerk

Filed: '89 FEB 23 AM 11 54  ED SMITH CLERK  MONTANA SUPREME COURT

Mr. Chief Justice J. A. Turnage delivered the Opinion of the Court.

This lawsuit is a debt collection and foreclosure action against the principal Ralph Meyers and Sons (Corporation) and its surety and guarantor, Keith Meyers (Meyers) individually, with additional counts by plaintiff Montana Bank of Circle (Bank) alleging fraud, wrongful conversion and controlling stockholder individual liability (piercing the corporate veil). Defendants counterclaimed against the Bank and filed a third-party suit against the bank holding company, Montana Banksystem, Inc. (MBI), for breach of the implied covenant of good faith and fair dealing.

The District Court, Seventh Judicial District, McCone County, sitting without a jury, granted summary judgment in favor of the plaintiff Bank on Counts I (default), II (foreclosure of security interest), and VII (individual liability) of its complaint, establishing both defendants' liability on the underlying note and dismissing all other claims. The summary judgment dismissed the counterclaim and third-party action as well.

The District Court based its summary judgment on the surety and guaranty documents which were signed by Meyers and which the court ruled were in effect at the time the corporation defaulted on its note. Defendants appeal.

The issue on appeal is whether there is any genuine issue of material fact precluding summary judgment on Meyers' contentions that he is not personally liable for the default of his corporation and that the Bank acted in bad faith toward him individually.

We affirm.

2

## I. THE SURETY AND GUARANTY AGREEMENTS

Corporation borrowed $293,000 from the Bank on September 30, 1986, and signed a promissory note and security agreement evidencing the debt. Prior to this occasion, the course of dealing between the parties is outlined below:

| | |
|---|---|
| 7-25-83 | Loan with $200,000 Guaranty |
| 6-11-84 | Loan with Security & $500,000 Surety Agreements |
| 10-30-84 | $100,000 Surety Agreement |
| 11-20-84 | $150,000 Surety Agreement |
| 6-06-85 | $120,000 Loan with Surety Agreement |
| 10-07-85 | $300,000 Loan with Security Agreement |
| 9-30-86 | $293,000 Loan in Question |

All of the above loans were repaid prior to the September 1986 loan in question.

The October 7, 1985, loan was repaid in September 1986 with proceeds from the loan in question. No surety or guaranty documents were executed contemporaneously with the October 1985 loan or the September 1986 loan. Bank argues that none were necessary because the surety documents that had previously been executed between the parties all expressly stated that they were "open and continuing" in nature, covering all indebtedness of the principal whenever or however incurred.

Meyers contends that each surety was attached to a specific note and should be exonerated as a matter of law when each note was repaid; since no surety agreement was executed at the time of the September 1986 loan, he argues that he is not personally liable for the corporate default.

3

Thus, the legal question becomes, what exonerates a surety under this contract?

The specific language relied on by Bank is as follows:

### SURETY AGREEMENTS

For a valuable consideration, Borrower [the corporation] and surety [Keith Meyers] jointly, severally, and unconditionally are bound to pay to the Bank, its successors or assigns, on demand, in lawful money of the United States of America, any and all indebtedness of the Borrower to Bank, as follows:

. . .

3. Nature of Surety's Undertaking. The liability of Surety shall be open and continuous for so long as this surety agreement is in force. Surety intends to be responsible at all times for the performance of all obligations of Borrower to Bank within the limits of Section 1. Thus, no payments made upon Borrower's indebtedness will discharge or diminish the liability of Surety for any and all remaining and succeeding indebtedness of Borrower to Bank. The liability of Surety will be enforceable against both the separate and community property of Surety whether now owned or hereafter acquired.

. . .

5. Duration of Surety Agreement. This surety agreement will take effect when received by Bank, without the necessity of any acceptance by Bank, and will continue in full force until such time as Surety notifies Bank in writing, at the branch or office of Bank to which this surety agreement is delivered in the first instance, of Surety's election to terminate the same. [Emphasis added.]

4

<u>GUARANTY</u>

. . . The undersigned hereby <u>absolutely</u> <u>and</u> <u>unconditionally</u> <u>guarantees</u> <u>prompt</u> <u>payment</u> when due and at all times thereafter <u>of</u> <u>any</u> <u>and</u> <u>all</u> <u>existing</u> <u>and</u> <u>future</u> <u>indebtedness</u> and liability of every kind, nature and character (including all renewals, extensions and modifications thereof) <u>from</u> <u>the</u> <u>Borrower</u> <u>to</u> <u>the</u> <u>Bank</u>, <u>howsoever</u> <u>and</u> <u>whensoever</u> <u>created</u>, <u>or</u> <u>arising</u>, <u>or</u> <u>evidenced</u>, <u>or</u> <u>acquired</u>; and the undersigned waives notice of the acceptance of this Guaranty and of any and all such indebtedness and liability.

. . .

<u>This</u> <u>Guaranty</u> is made and <u>shall</u> <u>continue</u> <u>as</u> <u>to</u> <u>any</u> <u>and</u> <u>all</u> <u>such</u> <u>indebtedness</u> <u>and</u> <u>liability</u> <u>of</u> <u>the</u> <u>Borrower</u> <u>to</u> <u>the</u> <u>Bank</u> <u>incurred</u> <u>or</u> <u>arising</u> <u>prior</u> <u>to</u> <u>receipt</u> <u>by</u> <u>the</u> <u>Bank</u> <u>of</u> <u>written</u> <u>notice</u> of the termination hereof from the undersigned . . . [Emphasis added.]

Meyers relies on § 28-11-413, MCA, which reads:

<u>Effect</u> <u>of</u> <u>performance</u> <u>or</u> <u>offer</u> <u>of</u> <u>performance</u> <u>on</u> <u>surety's</u> <u>liability</u>. Performance of the principal obligation or an offer of such performance, duly made as provided in this code, exonerates a surety.

Meyers argues that "performance of the principal obligation" means payment of each note. Thus, he argues that each surety obligation was exonerated as he repaid each outstanding loan, contrary to the express language in the contract.

Bank argues that when the contract is silent as to termination, the statute will apply to terminate the suretyship for the debts of the principal which have been repaid. However, the statute would not supply the date <u>or</u> method of

5

termination when the unambiguous written contract expresses that termination may only be effected by written notice.

We affirm the lower court's finding that the sureties were not exonerated by operation of law under § 28-11-413, MCA.

Meyers raises exoneration as defined under 28-11-413, MCA, as his third affirmative defense in his amended answer and counterclaim dated February 18, 1988. However, the contracts which he signed expressly waive his right to exoneration in that manner: Paragraph #3 ". . . Thus, no payments made upon Borrower's indebtedness will discharge surety's obligation . . ." (Emphasis added.)

We conclude that this is a valid waiver of rights. Because it is not a constitutional right, nor a waiver in violation of public policy, Meyers was entirely free to contract away his right to the statutory exoneration of his suretyship, which he did. See, Kelly v. Lovejoy (1977), 172 Mont. 516, 565 P.2d 321 (waiver may be proved by a course of acts or conduct so as to induce the belief that the intention and purpose was to waive); and Thiel v. Johnson (Mont. 1985), 711 P.2d 829, 42 St.Rep. 2010 (waiver may be express or implied).

A similar waiver under a guaranty contract occurred in Riverside Nat. Bank v. Manolakis (Okla. 1980), 613 P.2d 438. We find the analysis in Manolakis persuasive. In that case, the guarantor argued that his obligations were satisfied by operation of law because the creditor bank had failed to seek a deficiency judgment against the principal within ninety days as per Oklahoma statutory law. Such failure released the principal. However, the court concluded that the guarantor was still liable, saying:

> What defenses remain available to a
> guarantor under [the statute] . . . must

6

be determined by the terms of the guar-
anty contract, i.e., by the breadth of
the guarantor's promise.   In the case
before us, the guarantor, by the clear
provisions of his promise, expressly
waived all of the available [statutory]
defenses.

Manolakis, 613 P.2d at 439.

Meyers likewise waived his statutory defenses available
to him as a surety and no exoneration is effected in this
case under § 28-11-413, MCA.

However, this Court finds the central question here is
not merely one of exoneration, but more realistically, what
was the nature of the relationship between the parties.
Meyers, Corporation and Bank began a course of dealing, based
on a series of written contracts, to establish a line of
credit for the benefit of Corporation.   As is standard bank-
ing practice in Montana, Bank would not loan such large
amounts of money to a closely-held family corporation without
a personal guaranty or surety from the major individual
stockholder.   The intent of the parties to aid corporation by
lending money but to protect Bank with personal guaranties is
entirely clear from the written documents which establish
this relationship.

Based on this relationship, we find no alternative but
to affirm the lower court's findings that the surety agree-
ments are in effect and Meyers is in fact personally liable
for the default of Corporation.   We affirm that the sureties
dated October 30, 1984 for $100,000; November 20, 1984 for
$150,000; and June 6, 1985 for $120,000 were in effect and
cumulatively cover the $293,000 default.   However, the surety
dated June 11, 1984, for $500,000 fails as a matter of law
because Meyers did not sign it in his individual capacity on

7

the line designated for the surety. It was not duly executed. Thus, that contract fails.

As noted above, Paragraph 3 of the agreement outlining the nature of surety's undertaking states, "The liability of surety shall be open and continuous for so long as this agreement is in force . . . Thus, no payments upon Borrower's indebtedness will discharge the liability of surety for any and all remaining and succeeding indebtedness of Borrower to Bank." This express language must be given effect until terminated. Paragraph #5 states termination is only effected when surety notifies Bank in writing. Additionally telling is the fact that in triple size, bold face, capital letters directly above Meyers' signature it reads, "EFFECTIVE UNTIL TERMINATED IN THE MANNER SET FORTH . . . ABOVE," negating any possibility that the termination clause was merely adhesive language. Meyers admits he gave no such written termination to Bank. To have Meyers be individually liable for the line of credit established by Corporation and evidenced by the guaranty and four sureties is the obvious and expressed intent of the parties.

Meyers sought to introduce parol evidence as to his contrary intent to have each surety agreement be "note specific," i.e., for the suretyship to be released and start anew as each debt was repaid. Although his counsel admitted at the hearing on summary judgment that each document is clear and unambiguous on its own, he argued that when taken as a series of transactions, they create an ambiguity as to Meyers' intent regarding the continuing nature of his liability. Thus, he argues that ambiguity should either be resolved against the Bank as makers of the documents, or by allowing him to introduce parol evidence.

The lower court found no ambiguity in the documents, the same was admitted by both counsel, and refused all parol

evidence of contrary intent. We agree. The rule has long been that where no ambiguity exists in the written documents, no parol evidence may be taken, Nordlund v. School District (Mont. 1987), 738 P.2d 1299, 44 St.Rep. 1183, and the duty of the court is simply to apply the language as written.

The lower court also enforced the express language of the guaranty which held Meyers individually liable to the extent of $200,000. We agree. The operative language is substantially the same as the sureties discussed above.

A guarantor differs from a surety in that a surety holds primary liability equal with that of the original borrower. However, a guarantor does not become liable until an intervening act occurs, such as a default of the original borrower. Compare §§ 28-11-401 and 28-11-101, MCA; see also, Stensvad v. Miners & Merchants Bank of Roundup (1979), 183 Mont. 160, 598 P.2d 1083.

In the instant case, Bank exhausted its remedies against Corporation and the collateral. Thus, it was ripe to proceed against Meyers as both a surety and a guarantor.

We note here that had the above-mentioned surety documents failed legally as per Meyers' argument that they were exonerated, their language still would have effected a guaranty against Meyers individually under the facts of this case. Because Montana has no comparable exoneration statute for guaranties as it does for sureties, and because Bank had already sought recovery against the Corporation, and the collateral after a default, at the very least Meyers would be a guarantor under all of the duly-executed documents. In its broadest sense, every suretyship includes a guaranty. Suretyship, Simpson (1977). Thus, the operative language in these surety agreements also effectuated a guaranty. The District Court is affirmed on that issue.

9

## II. BAD FAITH

The District Court summarily dismissed defendants' bad faith claims against both the Bank and MBI. We affirm.

Defendants' contentions fail both as a matter of factual proof and as a matter of law. Meyers named certain livestock and equipment as collateral for his loans in the security agreements he executed. However, immediately after procuring the loan in question, Meyers sold the collateral to pay off a debt to Saul Stone, a new York stockbroker, for losses he incurred in the futures market. Additionally, Meyers applied the proceeds from the corporate loan to the same debt. It is undisputed that Meyers took these actions without advising the Bank of his intent to do so and, in fact, did not advise the Bank of his actions until the Corporation was about to default.

In his deposition, Meyers testified that the facts amounting to the Bank's bad faith (and MBI as being "inextricably intertwined" to the Bank) were (1) failing to renegotiate the defaulted note with the Corporation, (2) publishing slanderous statements about Meyers in the District Court complaint, and (3) spreading rumors about Meyers' financial inability in order to "shut him down" in his ranching/business community.

This Court has never held that a Montana bank is under a duty to renegotiate a defaulted loan and Meyers is unable to point to case law anywhere which so holds. That argument is without merit. Because there is no evidence that a duty exists, Bank is entitled to summary judgment. First Trust Co. of Montana v. McKenna (1980), 188 Mont. 534, 614 P.2d 1027. See also, Central Bank of Montana v. Eystad (Mont. 1985), 710 P.2d 710, 42 St.Rep. 1850 (the bank has no duty to renew or extend the note indefinitely); § 28-1-211, MCA (bank need only act in a commercially reasonable manner); First

10

Nat'l Montana Bank of Missoula v. McGuiness (Mont. 1985), 705 P.2d 579, 42 St.Rep. 1288 (the exercise of good business sense does not constitute bad faith).

Likewise, Meyers' second argument pertaining to the "bad faith filing of fictitious and slanderous claims" printed by Bank in its complaint is also without merit. It has long been held that statements made in a judicial proceeding are absolutely immune and a cause of action for defamation cannot be predicated thereon. Section 27-1-804(2), MCA; see Bollinger v. Jarrett (1965), 146 Mont. 355, 406 P.2d 834 ("[T]here is no libel because any publication made in a judicial proceeding is privileged"). Bank and MBI were entitled to summary judgment on that issue.

Lastly, is the question of certain rumors which Meyers alleges that Bank instigated against him in order to put him out of business. This allegation fails both factually and legally. Because of the long and involved facts, we choose to discuss the legal aspects of this issue instead.

The relationship between the parties was defined by their underlying commercial contracts. Based on those underlying contracts, two crucial facts come to light: (1) Bank did not breach the contracts; (2) Meyers breached the contracts.

It can be said fairly that the underlying contracts subsumed the entirety of the relationship between Bank and Meyers. They had no course of dealing or external relationship, absent their commercial contract. Thus, Montana law requires an initial finding that Bank breached that contract to have liability for bad faith conduct attach.

Since the Bank had not breached the underlying contract (promissory note and security agreement), it cannot be said that Bank acted unreasonably and in bad faith. Nordlund v. School Dist. No. 14 (Mont. 1987), 738 P.2d 1299, 44 St.Rep.

11

1183, and Maxwell v. Sisters of Charity of Providence (D. Mont. 1986), 645 F.Supp. 937.

Additionally, "it is a well-settled rule of contract law that a party who commits the initial breach cannot complain of a subsequent breach." Malloy v. Judge's Foster Home (Mont. 1987), 746 P.2d 1073, 44 St.Rep. 1996. Meyers committed the initial breach when he secretly sold the Bank's collateral and is barred from subsequently claiming the Bank treated him unfairly and in bad faith on their contract.

Based on the conduct of the parties with regard to the underlying contracts, no liability can attach for bad faith. Summary judgment in favor of the Bank was proper.

Meyers' attempt to hold MBI, the bank holding company, liable for bad faith is baseless. He admitted at hearing that he and his corporation had no independent relationship with MBI into which the covenant could be implied. But, he argued that the Bank owed him a duty of good faith as its customer and that MBI was likewise bound by this duty because it is "inextricably intertwined" with the Bank.

Meyers was unable to put forth any Montana law to support his contention that an affiliation between two parties may transfer one party's duty of good faith onto another party. Likewise, Meyers brought forth no evidence by way of affidavit or deposition testimony, or otherwise, to prove a relationship between MBI, the Bank and himself.

MBI argues that summary judgment for them was proper on this count because of Meyers' failure of proof. The summary judgment hearing was the time for Meyers to put forth the evidence of these relationships, if any existed. We agree.

Meyers and his corporation had a bank-customer relationship with Bank. However, no evidence was presented which suggested this was a special or fiduciary relationship onto which the covenant is applied under Tribby v. Northwestern

12

Bank of Great Falls (Mont. 1985), 704 P.2d 409, 42 St.Rep. 1133.

There was no evidence that Bank encouraged the loans, advised Meyers or acted as his confidant. To the contrary, Meyers admitted he deliberately did not tell the Bank of his corporate conduct until it was over. MBI cannot be held liable for bad faith under these facts. Summary judgment was proper.

The appellate standard of review of a summary judgment is the same as that used by the trial court. In order for summary judgment to issue, the movant must show that there is no genuine issue as to all material facts. Bindrim v. University of Montana (Mont. 1988), _____ P.2d _____, 45 St.Rep. 2316. Based on the foregoing credible evidence, Bank and MBI have met their burden. We conclude that no genuine issues of material fact exist.

Judgment affirmed.

_____
Chief Justice

We concur:

_____

_____

_____

_____

_____

_____
Justices