No. 05-565

IN THE SUPREME COURT OF THE STATE OF MONTANA

2006 MT 236

PRECISION THEATRICAL EFFECTS, INC.,
a Montana corporation, and RUSSELL R.
NICKEL, an individual,

        Plaintiffs and Appellants,

   v.

UNITED BANKS, N.A., formerly known as
UNITED BANK OF COLUMBUS, N.A.,

        Defendant and Respondent.

APPEAL FROM:    The District Court of the Twenty-Second Judicial District,
                    In and For the County of Stillwater, Cause No. DV-2003-21,
                    Honorable Blair Jones, Presiding Judge

COUNSEL OF RECORD:

        For Appellants:

                W. Scott Green, Patten, Peterman, Bekkedahl & Green, PLLC,
                Billings, Montana

                Paul G. Matt, Attorney at Law, Billings, Montana

        For Respondent:

                Michael G. Alterowitz, Timothy B. Strauch, and Kelton D. Olney,
                Alterowitz, Strauch & Olney, P.C., Missoula, Montana

Submitted on Briefs: June 1, 2006

Decided: September 19, 2006

Filed:

_____
Clerk

Justice W. William Leaphart delivered the Opinion of the Court.

¶1 Precision Theatrical Effects, Inc. ("PTE"), and Russell R. Nickel, in his individual capacity, filed a complaint in the Twenty-Second Judicial District Court alleging three counts against United Banks, N.A. ("United"). United moved for summary judgment on all issues, while PTE and Nickel moved for partial summary judgment. The court granted summary judgment to United on all three issues and denied plaintiffs' motion.

¶2 We restate the issues as follows:

¶3 1. Did the District Court err in concluding, as a matter of law, that since PTE and Nickel defaulted on the bank loans, United did not commit breach of contract in freezing PTE's bank accounts?

¶4 2. Did the District Court err in granting summary judgment on the question of whether United breached the implied covenant of good faith and fair dealing as a matter of law?

¶5 3. Did the District Court err in determining that no fiduciary relationship existed between the plaintiffs and United?

¶6 We reverse in part and affirm in part.

**BACKGROUND**

¶7 PTE, a business that manufactured explosive pyrotechnic materials, and Nickel, the company's former majority owner and president, began a business relationship with United in 1997. As of April 2000, PTE had five loans in good standing with United. The

2

total due on the combined PTE loans amounted to $170,420.50; Nickel also owed United an additional $41,164.66 on a separate loan.[1] At the time, the loans were secured by the following collateral: $110,000 held by United, $374,000 of accounts receivable, and $1,254,000 in assets. The loans were governed by promissory notes and security agreements which provided that PTE and Nickel would be in default if they "do or fail to do something which causes [United] to believe that [United] will have difficulty collecting the amount [owed]."

¶8 On November 8, 1999, United put a hold on all of PTE's accounts after law enforcement raided Nickel's residence and PTE's business premises. On April 11, 2000, Nickel was arrested in Stillwater County, Montana, and charged with nine felony counts related to possession, manufacture and sale of dangerous drugs. In order to conduct its business involving pyrotechnics, PTE was required to have a license from the Bureau of Alcohol, Tobacco and Firearms (ATF). The corporation's ATF license was in Nickel's name at the time of his arrest. Federal law prohibits anyone who engages in the business of importing, manufacturing, or dealing in explosive material to operate without a license. 18 U.S.C. § 842(a)(1) (2000). The law also precludes any licensee, while under felony indictment, from shipping or transporting any explosive in interstate or foreign commerce or to receive or possess any explosive which has been shipped or transported in interstate or foreign commerce. 18 U.S.C. § 842(i)(1) (2000).

---

[1]The loans to PTE included: No. 489 owing $17,767.84; No. 350 owing $119,163.17; No. 173 owing $13,604.41; No. 73 owing $8,546.57; No. 228 owing $11,338.51. The loan to Nickel was No. 763 owing $41,164.66.

¶9     United learned of Nickel's arrest on the day it occurred. Even though PTE's and Nickel's loans were current, United placed a hold on PTE's accounts from April 11, 2000, until April 28, 2000. While the loan contracts did not specify "accounts freezing" as a remedy, the agreements did provide for setoff. United, however, chose to freeze the accounts, rather than setoff existing loan obligations. During the time PTE's and Nickel's accounts remained frozen, several of their checks were returned despite the fact that funds existed to pay the checks.

¶10    Also on the same day as his arrest, Nickel's wife petitioned for divorce and requested a temporary restraining order barring the transfer, concealment or disposal of marital property. Consequently, at some point between April 11 and April 18, 2000, Nickel had $39,499.48 of PTE Europe BV funds transferred into his divorce attorney's trust account.

¶11    On April 18, 2000, about a week after Nickel's arrest, United sent PTE and Nickel notices that they were in default on their loans for the following reasons: Nickel was 90 percent stockholder and held the federal license required to operate the business; Nickel was barred from having contact with PTE because of pending criminal charges; ATF advised United that the criminal charges placed Nickel's ATF license in jeopardy; Nickel's wife filed for divorce and Nickel's parents (as landlords) threatened to evict the corporation; and Nickel moved $39,499.48 from PTE accounts receivable into his divorce attorney's trust account without advising United or seeking its consent.

4

Ultimately United chose not to pursue the April 18, 2000, notices of default, and instead decided to work with PTE's counsel to resolve matters. By April 28, 2000, United and PTE reached a conditional agreement whereby United would release PTE funds, allowing the business to continue operating. Although a memorandum agreement specifying the terms of the agreement was prepared, neither party apparently signed it.

¶12 Since Nickel's arrest prohibited him from having contact with any PTE employee, Nickel assigned control of the business to his wife. A couple of weeks later, after determining that his wife had failed to adequately manage the corporation, Nickel orally turned control over to his father, Dennis Nickel. On May 27, 2000, Dennis blocked the road leading to PTE, thus denying access to employees. That same day, Nickel sent an official letter to his father terminating his wife and appointing Dennis as PTE's manager. In June 2000, Dennis informed United that he had sold PTE equipment, even though United had not requested such a sale. On June 5, 2000, United asked for assurances that PTE would reopen and resume normal operating procedures. Ten days later, on June 15, 2000, United issued a second set of default notices, setting forth the same bases as the April 18 notice, along with the following additional grounds: ATF advised that Nickel had failed to comply with ATF regulations and therefore revocation proceedings would be initiated; United had been told that equipment was sold for the purpose of shutting down the business, but Nickel refused to disclose the location of the equipment or identities of the purchasers; Nickel's order violated court orders; PTE failed to provide an

5

accounting of accounts receivable; PTE employees were prevented from working and essential operating equipment had been sold; and PTE's landlord evicted the business because it failed to negotiate a lease. On July 10, 2000, United informed PTE's counsel that it would commence foreclosure proceedings if it did not receive authorization to pick up collateral. Thereafter, United agreed to postpone the commencement of foreclosure proceedings. On November 29, 2000, United filed suit to foreclose on four of the six loans.

¶13 On June 2, 2003, PTE and Nickel filed a complaint setting forth the following causes of action against United: (I) "on June 2, 2000, and thereafter [United breached its contract with PTE and Nickel by committing] acts and omissions outside of the accepted commercial banking practices to deprive [PTE and Nickel] of the benefit of their contract with [United]"; (II) "after April 11, 2000, [PTE and Nickel] and [United] entered into a contract involving a special relationship [and] on or about June 2, 2000, [United] breached its contractual implied covenant of good faith and fair dealing with [PTE and Nickel] based on their special relationship"; and (III) "after April 11, 2000, [United] committed acts which influenced PTE's business and advised and consulted with PTE . . . [and] such acts by [United] are proof of special circumstances between the parties and gave rise to fiduciary responsibilities" which United breached.

¶14 The dissent argues that PTE and Nickel's claims would not have survived a motion to dismiss on the pleadings because they did not specifically allege that United

6

lacked "honesty in fact" in declaring a default and freezing PTE's bank accounts. PTE and Nickel did allege, however, that United breached the implied covenant of good faith and fair dealing when it declared a default and froze all of PTE's and Nickel's bank accounts. Under notice pleading, this is sufficient to bring into play the statutory definition of "good faith" as meaning "honesty in fact in the conduct or transaction concerned." Section 30-1-201(19), MCA (1999). *See Kunst v. Pass*, 1998 MT 71, ¶¶ 35-36, 288 Mont. 264, ¶¶ 35-36, 957 P.2d 1, ¶¶ 35-36 (complaint's reference to the Landlord and Tenant Act sufficient to give notice of possible attorney fees provided for under the Act). In addition, a complaint should not be dismissed unless it appears certain that the plaintiff will be unable to recover under any set of facts which could be proven in support of his claim. *Kleinhesselink v. Chevron, U.S.A.*, 277 Mont. 158, 161, 920 P.2d 108, 110 (1996).

¶15 United moved for summary judgment contending that the terms of the security agreements stated that PTE and Nickel would be in default if they "do or fail to do something which causes [United] to believe that [United] will have difficulty in collecting the amount [PTE and Nickel] owe . . . ." According to United, undisputed material facts show that PTE and Nickel engaged in actions that caused United to believe it would have difficulty collecting on the loans. Such actions included the nine felony counts charged against Nickel; the chance PTE's ATF license would be revoked because it was in Nickel's name; the moving of $39,499.48 from PTE's accounts into the trust

7

account of Nickel's divorce attorney without advising United or seeking its consent; closing the road to the corporation; and the sale of collateral to unidentified purchasers for an undisclosed amount. Based on the foregoing, United argued that it had legitimate reasons to believe that its ability to collect on the loans had been jeopardized and therefore, by the terms of the security agreements, PTE and Nickel were in default. United noted that instead of seeking immediate acceleration and foreclosure, it attempted to workout an agreement with PTE and Nickel and only when that failed did it send second notices of default and seek to foreclose.

¶16 United further argued that it had not breached the contract because PTE and Nickel could not establish that United failed to act with "honesty in fact" or that it did not observe reasonable commercial standards, as mandated by Montana law. United asserted that it acted reasonably in light of PTE's and Nickel's contractual defaults. United also argued that it did not breach the implied covenant of good faith and fair dealing in tort, as alleged, because no "special relationship" existed between United and PTE and Nickel, as required by law. Finally, United noted that a fiduciary relationship between a bank and a customer only exists under special circumstances where there are exclusive and repeated dealings with the same bank, which did not exist in this case.

¶17 In response, PTE and Nickel moved for partial summary judgment on the issue of breach of contract, asserting that United breached the covenant of good faith when it froze the accounts without legal authority and caused PTE damage as a result. More

8

specifically, PTE and Nickel argued that they did not default on their loans and even if they had, nothing in the loan documents allowed United to freeze the accounts.

¶18 The District Court granted summary judgment to United, concluding that it had "substantial reason to believe" that Nickel's ATF license was at risk of being revoked and therefore its declaration of default was "reasonable and allowable" under the terms of the agreements since United believed, in good faith, that it might have difficulty collecting on the loans. The court further concluded that because United had the right to setoff PTE's and Nickel's accounts, it also had the right to take the "far less onerous" action of freezing the accounts. The court dismissed Count I, held that Counts II and III failed as a matter of law, and denied PTE and Nickel's motion for partial summary judgment.

¶19 PTE and Nickel now appeal, asking this Court to reverse the District Court's order granting summary judgment.

## STANDARD OF REVIEW

¶20 This Court's review of a district court's grant of summary judgment is *de novo*. Our evaluation is the same as that of the trial court. We apply the criteria contained in M. R. Civ. P. 56. According to this rule, the moving party must establish both the absence of a genuine issue of material fact and entitlement to judgment as a matter of law. If this is accomplished, the burden then shifts to the non-moving party to prove, by more than mere denial and speculation, that a genuine issue does exist. If the court determines that no genuine issues of fact exist, the court must determine whether the

moving party is entitled to judgment as a matter of law. *Gliko v. Permann*, 2006 MT 30, ¶ 12, 331 Mont. 112, ¶ 12, 130 P.3d 155, ¶ 12.

## DISCUSSION

¶21 **1. Did the District Court err in concluding, as a matter of law, that since PTE and Nickel defaulted on the bank loans, United did not commit breach of contract in freezing PTE's bank accounts?**

¶22 The District Court dismissed Count I of PTE and Nickel's complaint, which alleged that United committed breach of contract. The court, citing *Montana Bank of Circle v. Meyers & Son*, 236 Mont. 236, 245 P.2d 1209 (1989), concluded that PTE and Nickel were barred from making such a claim because they committed the initial breach of contract by defaulting on their loans. In reaching this decision, the court noted that provisions in the security agreements clearly stated that PTE and Nickel would be in default if anything happened to cause United to "believe" it would have "difficulty collecting" on the loans. The District Court reasoned that since PTE operated under Nickel's ATF license and federal law prohibits any licensee from conducting business involving explosives while under felony indictment, United had "substantial reason to believe . . . that there was real potential for a revocation of Nickel's license at the time of his arrest." The court thus concluded that "uncontested facts" showed that PTE and Nickel defaulted on their loans. We disagree.

10

¶23 The contract language states that PTE and Nickel would be in default if "anything . . . happens that causes [United] to believe that [it would] have difficulty collecting the amount [owed]." Certainly, uncontested facts show that United knew of Nickel's arrest, as well as the federal laws surrounding pyrotechnic sales and licensing. It does not automatically follow, however, that no genuine issues of material fact exist as to whether United, based on the contract language, had cause "to believe that [it would] have difficulty collecting." This provision must be read in conjunction with § 30-1-203, MCA,[2] and § 30-1-208, MCA (1999),[3] which impose an obligation of "good faith" in the enforcement of a contract provision. The issue as to whether United breached the contract hinges upon a determination of whether its belief that it would have difficulty collecting the amount due from PTE and Nickel was a *good faith* belief and whether it acted with honesty in fact when it invoked a remedy (freezing of bank accounts) not provided for in the contract. "[T]he breach of a duty of good faith is a question of fact not susceptible to summary judgment." *Dobrocke v. City of Columbia Falls*, 2000 MT 179, ¶ 51, 300 Mont. 348, ¶ 51, 8 P.3d 71, ¶ 51 (overruled on other grounds) (quoting

[2]Section 30-1-203, MCA, provides that "[e]very contract or duty within this code imposes an obligation of good faith in its performance or enforcement."

[3]Section 30-1-208, MCA (1999), provides:

A term providing that one party or his successor in interest may accelerate payment or performance or require collateral or additional collateral "at will" or "when he deems himself insecure" or in words of similar import shall be construed to mean that he shall have power to do so only if he in good faith believes that the prospect of payment or performance is impaired. The burden of establishing lack of good faith is on the party against whom the power has been exercised.

*Simmons v. Jenkins*, 230 Mont. 429, 435, 750 P.2d 1067, 1071 (1988)).  Thus, given that the total due on the combined loans amounted to approximately $211,585 when United froze PTE's and Nickel's accounts, and United had collateral in the form of $110,000 cash in the bank, $374,000 of accounts receivable, and $1,254,000 in assets, it is for the factfinder to determine whether United had a good faith belief that it would have difficulty collecting the money owed on the outstanding loans.  The District Court erred in determining on summary judgment that PTE and Nickel defaulted on their loans.

¶24    In the alternative, PTE and Nickel argue that, even assuming arguendo that they were in default, United committed breach of contract when it froze PTE's and Nickel's accounts because such a remedy is not explicitly provided for in the loan agreements.  The District Court determined that "because the bank had the right to setoff [under the contracts] the entire amount of the debts against the accounts held with the bank, it also had the right to freeze the accounts."  We conclude, however, that there remains a question of fact as to whether United, when it froze the accounts, despite its arguably secure position and in the absence of specific contractual authority to do so, acted with "honesty in fact in the transaction concerned."

¶25    Since there are genuine issues of material fact as to whether United acted in good faith in declaring a default and in freezing the bank accounts, we reverse the District Court's grant of summary judgment dismissing PTE and Nickel's allegations of breach of contract.

12

**¶26 2. Did the District Court err in granting summary judgment on the question of whether United breached the implied covenant of good faith and fair dealing as a matter of law?**

¶27 Given our conclusion that there is a question of fact as to United's good faith in declaring a default and freezing bank accounts, it follows that the District Court also erred in granting summary judgment on Count II, breach of the implied covenant of good faith and fair dealing in tort. The covenant of good faith only becomes an issue if the trier of fact first determines that United breached its contract. *See Montana Bank of Circle*, 236 Mont. at 245, 769 P.2d at 1214 (because the bank had not breached the underlying contract, this Court held that it could not rule that the bank acted unreasonably and in bad faith). We therefore reverse the District Court's order granting summary judgment on Count II.

**¶28 3. Did the District Court err in determining that no fiduciary relationship existed between the plaintiffs and United as a matter of law?**

¶29 In Montana, the relationship between a bank and its customer is generally described as that of debtor and creditor, and does not give rise to fiduciary responsibilities. A limited exception to this rule exists, however, when special circumstances thrust a bank beyond the role of a simple creditor and into the role of advisor. *Lachenmaier v. First Bank Systems, Inc.*, 246 Mont. 26, 33, 803 P.2d 614, 618 (1990).

¶30 PTE and Nickel argue that the court erred in granting summary judgment on Count III because the record shows genuine issues of material fact exist as to whether they had a "special relationship" with United, giving rise to a fiduciary duty. More specifically, PTE and Nickel contend that since United controlled the checking accounts (which it froze), caused some checks to be returned, and then chose which checks to honor, a special relationship existed.

¶31 This Court recently reaffirmed in *Gliko*, ¶ 24, that "whether a fiduciary duty exists between two parties is a question of law, not fact, and it may be resolved on summary judgment when no genuine issues of material fact remain. Likewise, whether a 'special relationship' exists between two parties such as would give rise to a fiduciary duty is a question of law, not fact, for the relationship and the duty are two sides of the same coin." We also noted that since a "special relationship" does not normally exist in dealings between a bank and its customer, the court may have to make a fact-intensive inquiry. *Gliko*, ¶ 24. Importantly, however, while the circumstances of the particular relationship are factual and disputes over material facts will preclude summary judgment, "the *conclusion* drawn by a court from undisputed facts is one of law, not of fact." *Gliko*, ¶ 24.

¶32 In this case, PTE and Nickel argue that United's actions improperly influenced the internal affairs of PTE and that United took on an advisory position following the events of April 11, 2000. United, on the other hand, contends that there were no special circumstances, that PTE and Nickel had independent counsel, and that there was no

14

evidence that United had exclusive dealings with PTE and Nickel. While the legal import of these facts may be in dispute, the facts themselves are not. Thus, the District Court did not err in concluding, by way of summary judgment, that no special relationship or fiduciary duty existed.

## CONCLUSION

¶33 We reverse the District Court's summary judgment ruling as to Counts I and II, and affirm on Count III.


/S/ W. WILLIAM LEAPHART


We concur:


/S/ KARLA M. GRAY
/S/ PATRICIA COTTER
/S/ JAMES C. NELSON
/S/ BRIAN MORRIS


Justice Jim Rice dissenting in part and concurring in part.

¶34 Under Issue 1, the Court erroneously concludes that there was a genuine issue of material fact regarding whether United had a good faith belief that it would have difficulty collecting on its loans. I agree that the question of whether a duty of good faith was breached is generally reserved to the trier of fact. However, that general principle

15

does not relieve PTE and Nickel from the obligation of *alleging* facts sufficient to establish that United did not act in "good faith," as that term is defined under the applicable statute. In the summary judgment context, evidence of such facts must also be offered. Plaintiffs failed to do either. Indeed, their claim would not have survived a motion to dismiss on the pleadings.

¶35 The Court correctly cites § 30-1-208, MCA (1999), which requires that United must have "in good faith believe[d] that the prospect of payment or performance [was] impaired." The definition of good faith applicable to this case is the 1999 version of § 30-1-201(19), MCA, and reads as follows: "'Good faith' means *honesty in fact* in the conduct or transaction concerned." (Emphasis added.) In their District Court arguments, the parties used the definition of good faith under § 28-1-211, MCA, which references honesty and the observance of reasonable commercial standards, and reads similarly to the UCC definition in Title 30—as it was amended in 2005. However, the relevant events occurred prior to the 2005 amendment, and the District Court correctly recognized that the Title 30 definition of good faith, prior to the 2005 amendment, applied.

¶36 Thus, for PTE and Nickel to survive United's summary judgment motion, they had to allege (and offer evidence) that, not only did United have insufficient "reason to believe" its collection efforts would be impaired, but that United lacked good faith because it was *dishonest* in its asserted belief that the plaintiffs' prospects for repayment were impaired. PTE and Nickel never alleged such dishonesty, but instead alleged in

16

their complaint that United "committed acts and omissions outside of the accepted commercial banking practices" and argued in summary judgment that United "did not act according to reasonable commercial standards of fair dealing." These claims are made under the Title 28 standard, not the applicable Title 30 standard. By failing to allege dishonesty with respect to their good faith claim as required by the controlling statute, PTE and Nickel failed to state a claim upon which relief could be granted, and it should fail as a matter of law. As we recently held:

> Pursuant to Rule 8(a), M.R.Civ.P., a complaint must put a defendant on notice of the facts that the plaintiff intends to prove; the facts must disclose the elements necessary to make the claim; and the complaint must demand judgment for the relief sought by the plaintiff. *Kunst v. Pass*, 1998 MT 71, ¶ 35, 288 Mont. 264, ¶ 35, 957 P.2d 1, ¶ 35.

*Wise v. CNH Am., LLC*, 2006 MT 194, ¶ 8, 333 Mont. 181, ¶ 8, ___ P.3d. ___, ¶ 8. Here, the complaint failed to either allege dishonesty or provide any kind of indication of the facts which would be offered in support of such a claim. Thus, the pleading requirements we applied in *Wise* were not satisfied here.

¶37 The District Court held similarly, but focused on the lack of evidence, concluding that "Plaintiffs cannot prove a lack of honesty in fact relative to United Banks' decision to declare a default." This conclusion was based upon the proper definition of good faith and a correct assessment of Plaintiffs' failure of proof. I would affirm.

¶38     In view of my position under Issue 1 that United did not breach the contract, I would also affirm the District Court's imposition of summary judgment on Issue 2.  I concur with Court's disposition of Issue 3.

/S/ JIM RICE

Justice John Warner joins in the dissenting and concurring opinion of Justice Rice.

/S/ JOHN WARNER