No. 05-507

IN THE SUPREME COURT OF THE STATE OF MONTANA

2006 MT 307

MICHAEL J. MCCOY and DIANE P. MCCOY,

Plaintiffs and Appellants,

v.

FIRST CITIZENS BANK,

Defendant and Respondent.

APPEAL FROM:      The District Court of the Thirteenth Judicial District,
In and For the County of Yellowstone, Cause No. DV 2002-750,
Honorable Susan P. Watters, Presiding Judge

COUNSEL OF RECORD:

For Appellants:

David Duke, Attorney at Law, Billings, Montana

For Respondent:

Gerald B. Murphy, Nancy Bennett, Moulton, Bellingham,
Longo & Mather, P.C., Billings, Montana

Submitted on Briefs:  March 29, 2006

Decided:    November 29, 2006

Filed:

_____
Clerk

Justice Patricia O. Cotter delivered the Opinion of the Court.

¶1     In 1997, plaintiffs Michael and Diane McCoy (the McCoys) established a line of credit with the First Citizens Bank (the Bank) against which they periodically borrowed money for working capital associated with their cattle ranch. As of their last loan on January 21, 2000, the principal amount owed by the McCoys was $414,173.00. The Bank notified them that this amount was due on September 30, 2000, and that the Bank would not issue any further loans to them. The McCoys failed to pay the loan on September 30, or on January 31, 2001, the extended due date. On August 29, 2002, the Bank filed a complaint in the Thirteenth Judicial District Court for Yellowstone County seeking collection and foreclosure. The McCoys counterclaimed that the Bank's actions breached the covenant of good faith and fair dealing and breached the fiduciary duty the Bank owed the McCoys. Subsequently but prior to trial, the McCoys obtained funds and paid the Bank in full. The parties stipulated to dismissal of the Bank's claims, the caption of the case was re-styled with the McCoys as plaintiffs, and the case proceeded upon McCoys' claims. The Bank then moved for summary judgment and the District Court granted the motion. The McCoys appeal. We affirm.

## ISSUES

¶2     A restatement of the issues presented on appeal is:

¶3     Did the District Court err in granting the Bank's motion for summary judgment on the issue of breach of the covenant of good faith and fair dealing?

¶4     Did the District Court err in granting the Bank's motion for summary judgment on the issue of breach of fiduciary duty?

**FACTUAL AND PROCEDURAL BACKGROUND**

¶5 The McCoys became customers of the Bank in February 1997 when they obtained a line of credit there. The purpose of the line of credit was to increase their purebred cattle business. They initially borrowed $50,082.00 against this line of credit, with the cattle as collateral for the loan. Between February 1997 and March 1999, the McCoys obtained additional loans against this credit line. By May 6, 1999, the balance on the loan was $357,500.00.

¶6 In January 2000, the McCoys and the Bank entered into their last loan contract which increased the McCoys' indebtedness to the Bank to approximately $414,000.00. In exchange for this final loan, the McCoys gave the Bank a second mortgage on their real property. Under the terms of the contract, the McCoys were to pay the balance of their loan in one payment on September 30, 2000. The parties agreed that the McCoys would sell their herd by that date to acquire the funds to pay the note.

¶7 The McCoys scheduled their cattle sale for September 23, 2000. However, a severe snow storm occurred on September 21 and 22, 2000. According to Mike McCoy, he asked the Bank to allow them to postpone the liquidation sale and extend the due date of the loan. It is undisputed that the Bank refused to extend the loan's due date.

¶8 McCoys held the sale on September 23, but turn-out was poor and the bids for the cattle were low. After about 10 sales, McCoys cancelled the sale and sold the remaining cattle by private treaty to individual buyers contacted by telephone. The proceeds of the sale were much lower than the McCoys had expected and were not

enough to cover the balance of their loan. On November 30, 2000, the McCoys' note had a $217,906.61 balance. On that date the Bank extended the due date from September 30, 2000, to January 31, 2001. The McCoys did not pay the remaining balance.

¶9 On August 29, 2002, the Bank filed a complaint against the McCoys seeking judgment in the amount of $226,506.91, representing the balance due on that date. The McCoys counterclaimed that the Bank had breached the covenant of good faith and fair dealing and that it had breached its fiduciary duty to the McCoys. Subsequently and before the trial, the McCoys obtained funding with which to pay off the Bank. The Bank's claims were therefore dismissed and the District Court changed the style of the case to reflect the McCoys as plaintiffs and the Bank as defendant.

¶10 In February 2005, the Bank filed a motion for summary judgment. In April 2005, the District Court granted the motion. McCoys filed a timely appeal.

## STANDARD OF REVIEW

¶11 We review a district court's grant of summary judgment de novo, and apply the same criteria applied by the district court pursuant to M. R. Civ. P. 56(c). A district court properly grants summary judgment only when no genuine issues of material fact exist, and the moving party is entitled to judgment as a matter of law. *Sampson v. National Farmers Union Property*, 2006 MT 241, ¶ 7, 333 Mont. 541, ¶ 7, 144 P.3d 797, ¶ 7 (citation omitted).

4

¶12　*Did the District Court err in granting the Bank's motion for summary judgment on the issue of breach of the covenant of good faith and fair dealing?*

¶13　The McCoys argued to the District Court that the Bank breached the covenant of good faith and fair dealing when it refused to allow them to cancel their cattle sale and refused to lend them the additional funds necessary to care for the cattle until the sale could be rescheduled.[1]　Relying on *Story v. City of Bozeman*, 242 Mont. 436, 791 P.2d 767 (1990), McCoys asserted that to prevail on a contract-based breach, they need only establish the commercial standards of the trade and show that the Bank's conduct failed to meet those standards.　They maintained that the applicable commercial standards were those of the cattle industry, rather than the banking industry, and that it was the reasonable commercial standard to postpone a sale when severe weather is likely to impair turn-out.　By refusing to "permit" the McCoys to cancel their sale, the McCoys averred that the Bank failed to meet the applicable commercial standard.　The McCoys also opined that the Bank was "over-collateralized," holding McCoy assets valued at more than $1,161,000.00, and thus making their refusal to extend the due date more unreasonable.

¶14　The Bank countered that the McCoys' contractual claim alleging such a breach was without merit because the relevant contracts between the parties clearly required repayment of the loan on September 30, 2000, and did not commit the Bank to issuing

---

[1] In their Brief to this Court, McCoys acknowledge that the record does not establish that they requested additional funds to care for their cattle.

further loans to the McCoys. Moreover, the Bank maintained that the "trade" to which the covenant of good faith and fair dealing applies is the commercial banking industry, and that under its standards, the Bank gave the McCoys ample time to repay their loan and was under no legal obligation to extend the maturity date of the loan or lend more funds. It asserted that the McCoys failed to establish a contract claim, and therefore it was entitled to summary judgment as a matter of law.

¶15 Quoting *Simmons Oil Corp. v. Holly Corp.*, 258 Mont. 79, 87, 852 P.2d 523, 528 (1993), the District Court held that the Bank did not breach the covenant because the Bank's acts were "authorized by the express provisions of the contract, [therefore] no covenant of good faith and fair dealing can be implied which forbids such acts and conduct." The court continued that "[a] bank has the right to terminate financing as long as it does so reasonably and not capriciously." (Citing *Blome v. First Nat. Bank of Miles City*, 238 Mont. 181, 188, 776 P.2d 525, 529 (1989)).

¶16 On appeal, the McCoys argue they are not asserting that the Bank violated the covenant of good faith by refusing to lend additional money, but that it violated the covenant by refusing to extend time to pay the loan, which would have enabled them to sell their herd "in a commercially reasonable fashion." Without supporting authority, the McCoys continue to maintain that the applicable standard for this case is the cattle industry standard, which their experts testified would have meant postponement of the sale until better weather.

¶17 Additionally, the McCoys argue that because the Bank forced them to sell their cattle in a "fire sale," the three provisions of § 30-9A-627(2), MCA (2004), of the

U.C.C. requiring commercially reasonable disposition of collateral were not met. Acknowledging that § 30-9A-627(2), MCA, traditionally applies to the sale of collateral that has been repossessed and is being sold by the secured creditor, McCoys assert that to conclude that this provision does not apply to the circumstances before us would constitute "a hair splitting distinction . . . elevat[ing] form over substance." They allege that while they retained "possession" of the cattle collateral, the Bank was "in control" of the cattle.

¶18 The Bank repeats on appeal its argument that the applicable "trade standard" is the commercial banking standard and that the Bank's actions must be measured against that standard. It posits that to do otherwise would illogically subject a lending bank to hundreds of different commercial standards depending upon the business in which its borrower is engaged. It relies on *Lachenmaier v. First Bank Systems, Inc.*, 246 Mont. 26, 32, 803 P.2d 614, 617 (1990), in which this Court applied banking industry standards to a claim that First Bank breached the covenant of good faith and fair dealing with the Lachenmaiers.

¶19 The Bank further asserts that McCoys' claim that the Bank was over-collateralized is disingenuous given that the second mortgage signed by the parties on January 21, 2000, expressly stated that the maximum lien to which the Bank was entitled was $414,173.00—i.e., the amount of the principal indebtedness. The Bank also reiterates that it acted in complete accord with the express terms and conditions of its contract with McCoys and therefore under *Simmons Oil*, no breach of the contract or the covenant of good faith and fair dealing occurred.

7

¶20 Lastly, the Bank challenges McCoys' assertion that § 30-9A-627(2), MCA, applies to this case. First, the Bank argues that McCoys did not raise this argument in the District Court and therefore we should not address it. Second, the Bank maintains that § 30-9A-601, et. seq., MCA, deals with a *secured party's* rights after default, and therefore, this statute is irrelevant to the debtor-creditor situation before us. Moreover, the Bank posits that it was McCoys who, with ample time and notice, chose where, when and how to liquidate the cattle.

¶21 In *Story*, we conducted a detailed analysis of the contractual covenant of good faith and fair dealing. We held that:

> [E]very contract, regardless of type, contains an implied covenant of good faith and fair dealing. A breach of the covenant is a breach of the contract. Thus, breach of an express contractual term is not a prerequisite to breach of the implied covenant. For every contract not covered by a more specific statutory provision, the standard of compliance is that contained in § 28-1-211, MCA:
>
>> The conduct required by the implied covenant of good faith and fair dealing is honesty in fact and the observance of reasonable commercial standards of fair dealing in the trade.

*Story*, 242 Mont. at 450, 791 P.2d at 775.

¶22 We first address the "commercial trade standard" applicable to this transaction. We have consistently judged a bank's actions vis-à-vis a borrower's claim of breach by determining whether the bank's actions comport with banking industry standards. In *Blome*, we held that the bank had not breached the implied covenant of good faith and fair dealing when it denied a borrower's request for additional funds and notified the borrower, with little notice, that it would not renew the existing loans. We observed

8

that the bank made its decision after "analyzing the financial situation" of the Blomes and that it was entitled to make such a "business decision." *Blome*, 238 Mont. at 188, 776 P.2d at 529. Applying banking industry standards, we acknowledged that the bank's actions were driven by the policies and procedures employed by the bank in making lending decisions. In *Coles Dept. Store v. First Bank*, 240 Mont. 226, 783 P.2d 932 (1989), we concluded that First Bank's decision to discontinue financing Coles Department Store, after determining that it was experiencing accelerating financial deterioration, was based upon "prudent banking policy," and therefore did not constitute a breach of the implied covenant of good faith. See also *Tresch v. Norwest Bank of Lewistown, N.A.,* 238 Mont. 511, 778 P.2d 874 (1989) (Norwest's determination that providing additional funds to a borrower would not result in sufficient additional income to repay the loan was a decision based upon "solid business reasons" and not a breach of the implied covenant of good faith.). Lastly, in *Lachenmaier*, as argued by the Bank above, we noted that First Bank Systems, in foreclosing on Lachenmaier's loan, "was simply exercising sound business judgment as a creditor." *Lachenmaier*, 246 Mont. at 32, 803 P.2d at 617. Thus it was appropriate for the court to apply commercial banking industry standards to its analysis of the Bank's relationship with the McCoys and the McCoys' ability to service their loans.

¶23 As for McCoys' U.C.C. claim, nothing in the record establishes that McCoys raised this issue before the District Court, nor does the District Court address it in its Order. To the extent McCoys *may* have raised the theory at oral argument, failure to provide a full transcript of such proceeding precludes a review by this Court.

9

Therefore, based on the record before us and as we have held on numerous occasions, we will not address a new legal theory raised for the first time on appeal. *State v. Osterloth*, 2000 MT 129, ¶ 20, 299 Mont. 517, ¶ 20, 1 P.3d 946, ¶ 20.

¶24    The District Court concluded that since McCoys cancelled the sale without the Bank's permission to do so, their complaint was *not* that the Bank refused to let them cancel the sale but rather that the Bank refused to loan them additional funds.  After establishing this as the issue, the District Court held that the Bank's actions did not constitute a contractual breach of the covenant of good faith and fair dealing in that the actions were fully authorized by the express language of the contract signed by McCoys.  While the court may have misidentified the issue, the court's conclusion is nonetheless correct.  The Bank's refusal to extend the maturity date of McCoys' loan was both in accordance with the express provisions of the contract and comportable with prudent banking policy and reasonable commercial standards; therefore, it was not a breach of the covenant of good faith and fair dealing.  The District Court did not err in granting summary judgment in favor of the Bank on this issue.

¶25    *Did the District Court err in granting the Bank's motion for summary judgment on the issue of breach of fiduciary duty?*

¶26    The District Court, relying on *Simmons*, determined that the Bank's actions, as they pertained to the McCoys' account, were typical to a debtor-creditor relationship, as opposed to an "advisor-advisee" or "special" relationship, and, as such, did not give rise to a fiduciary duty.  The court also determined that had the Bank acted as a financial advisor, which under some circumstances may give rise to a fiduciary duty, the

10

relationship between the Bank and the McCoys did not in any event last long enough to establish such a fiduciary relationship.

¶27 The McCoys argue that the question of whether a "special relationship" existed between them and the Bank presented factual issues which precluded summary judgment. They maintain that factual evidence of a special relationship consisted of: (1) the Bank's annual requirements that McCoys submit a budget; (2) the Bank's demand that McCoys sell cattle in 1999; and (3) the Bank's demand that McCoys liquidate their herd by September 30, 2000, under poor weather conditions. Additionally, McCoys maintain that the District Court erred in determining that a "long history" between bank and borrower was a required element of a fiduciary relationship.

¶28 The Bank counters that summary judgment was appropriate because the facts relied on by the McCoys were immaterial and failed to establish that a "special relationship" existed between the Bank and the McCoys. The Bank argues that it is customary in agricultural banking to require a borrower to submit an annual budget for review by the lending bank. The Bank also asserts that requiring the McCoys to show a positive cash flow in 1999, through the sale of some cattle, was a business decision which did not create a fiduciary relationship. The Bank notes that the McCoys had shown a two-year negative cash flow in 1997 and 1998 but had continued to increase their debt with the Bank. It argues that requiring the McCoys to meet their loan obligations under their loan agreements does not put a bank in the position of a fiduciary.

¶29    Lastly, the Bank submits that it had the right to stop lending the McCoys money and to require the McCoys to pay their loans. At the time of the Bank's final loan to the McCoys in January 2000 it expressly established a loan maturity date of September 30 and expressly stated that this was the final loan. Relying on *Lachenmaier*, the Bank maintains that choosing not to extend the maturity date of McCoys' loan or to lend additional funds were prudent business decisions on the Bank's part and did not create a special relationship with a fiduciary duty.

¶30    In Montana, the relationship between a bank and its customer is generally described as that of debtor and creditor, and does not give rise to fiduciary responsibilities. A limited exception to this rule exists, however, when special circumstances place a bank beyond the role of a simple creditor and into the role of advisor. *PTE v. United Banks,* 2006 MT 236, ¶ 29, 333 Mont. 505, ¶ 29, 143 P.3d 442, ¶ 29 (citing *Lachenmaier*, 246 Mont. at 33, 803 P.2d at 618). Such "special circumstances" creating an advisor-advisee relationship (*Simmons Oil*, 258 Mont. at 85, 852 P.2d at 526) or an agency relationship (*Diest v. Wachholz*, 208 Mont. 207, 678 P.2d 188) *must* exist before a fiduciary duty arises. *Simmons Oil*, 258 Mont. at 85, 852 P.2d at 526.

¶31    Additionally, "whether a fiduciary duty exists between two parties is a question of law, not fact, and it may be resolved on summary judgment when no genuine issues of material fact remain. Likewise, whether a 'special relationship' exists between two parties such as would give rise to a fiduciary duty is a question of law, not fact, for the relationship and the duty are two sides of the same coin." *PTE*, ¶ 31.

12

¶32 In *PTE*, we also noted that since a "special relationship" does not normally exist in dealings between a bank and its customer, the court may have to make a fact-intensive inquiry. Importantly, however, while the circumstances of the particular relationship are factual and disputes over material facts will preclude summary judgment, "the conclusion drawn by a court from undisputed facts is one of law, not of fact." *PTE*, ¶ 31.

¶33 For the most part, the facts here are undisputed. To the extent a dispute was raised, the District Court construed the evidence in the light most favorable to the McCoys as the non-moving parties. See *Jobe v. City of Polson*, 2004 MT 183, ¶ 10, 322 Mont. 157, ¶ 10, 94 P.3d 743, ¶ 10. However, the District Court nonetheless concluded that the Bank's activities with respect to the McCoys did not elevate the relationship beyond that of a creditor and debtor. We agree. Nothing in the record suggests that the Bank thrust itself into the role of financial advisor. As the bank experts testified, the requirement of annual budgets is routine for agricultural borrowers. Moreover, the Bank did not force the sale of the McCoys' cattle; it simply sought to enforce the repayment provisions of its contracts with the McCoys. In sum, the Bank acted as a creditor, and nothing more. The District Court did not err in so concluding.

¶34 McCoys also challenged the District Court's conclusion that longevity of the debtor-creditor relationship was an "element" of a fiduciary duty. Having determined that no fiduciary relationship existed between the McCoys and the Bank, we need not address this claim.

¶35    For the foregoing reasons, we affirm the District Court.


/S/ PATRICIA COTTER


We concur:

/S/ JAMES C. NELSON
/S/ JOHN WARNER
/S/ W. WILLIAM LEAPHART
/S/ BRIAN MORRIS